FREEMAN ET AL. *v.* PITTS ET AL.

No. 89–1290.   Argued October 7, 1991—Decided March 31, 1992

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, and SOUTER, JJ., joined. SCALIA, J., *post*, p. 500, and SOUTER, J., *post*, p. 507, filed concurring opinions. BLACKMUN, J., filed an opinion concurring in the judgment, in which STEVENS and O'CONNOR, JJ., joined, *post*, p. 509. THOMAS, J., took no part in the consideration or decision of the case.

*Rex E. Lee* argued the cause for petitioners. With him on the briefs were *Carter G. Phillips, Mark D. Hopson, Gary M. Sams, Charles L. Weatherly,* and *J. Stanley Hawkins.*

*Solicitor General Starr* argued the cause for the United States as *amicus curiae* in support of petitioners. With him on the brief were *Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Deputy Assistant Attorney General Clegg, Ronald J. Mann, David K. Flynn,* and *Lisa J. Stark.*

*Christopher A. Hansen* argued the cause for respondents. With him on the brief were *Steven R. Shapiro, Helen Hershkoff, John A. Powell,* and *Willie Abrams.**

---

*Briefs of *amici curiae* urging reversal were filed for the Intervenors in *Carlin* v. *Board of Education San Diego Unified School District* by *Elmer Enstrom, Jr.;* and for the Southeastern Legal Foundation, Inc., by *G. Stephen Parker.*

Briefs of *amici curiae* urging affirmance were filed for the Lawyers' Committee for Civil Rights Under Law by *Norman Redlich* and *Burke Marshall;* and for the NAACP, DeKalb County, Georgia, Branch et al. by *William H. Allen* and *Elliott Schulder.*

*Charles S. Johnson III* filed a brief for plaintiff-intervenors as *amici curiae.*

JUSTICE KENNEDY delivered the opinion of the Court.

DeKalb County, Georgia, is a major suburban area of Atlanta. This case involves a court-ordered desegregation decree for the DeKalb County School System (DCSS). DCSS now serves some 73,000 students in kindergarten through high school and is the 32d largest elementary and secondary school system in the Nation.

DCSS has been subject to the supervision and jurisdiction of the United States District Court for the Northern District of Georgia since 1969, when it was ordered to dismantle its dual school system. In 1986, petitioners filed a motion for final dismissal. The District Court ruled that DCSS had not achieved unitary status in all respects but had done so in student attendance and three other categories. In its order the District Court relinquished remedial control as to those aspects of the system in which unitary status had been achieved, and retained supervisory authority only for those aspects of the school system in which the district was not in full compliance. The Court of Appeals for the Eleventh Circuit reversed, 887 F. 2d 1438 (1989), holding that a district court should retain full remedial authority over a school system until it achieves unitary status in six categories at the same time for several years. We now reverse the judgment of the Court of Appeals and remand, holding that a district court is permitted to withdraw judicial supervision with respect to discrete categories in which the school district has achieved compliance with a court-ordered desegregation plan. A district court need not retain active control over every aspect of school administration until a school district has demonstrated unitary status in all facets of its system.

I

A

For decades before our decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954) *(Brown I),* and our mandate in

*Brown* v. *Board of Education,* 349 U. S. 294, 301 (1955) *(Brown II),* which ordered school districts to desegregate with "all deliberate speed," DCSS was segregated by law. DCSS' initial response to the mandate of *Brown II* was an all too familiar one. Interpreting "all deliberate speed" as giving latitude to delay steps to desegregate, DCSS took no positive action toward desegregation until the 1966–1967 school year, when it did nothing more than adopt a freedom of choice transfer plan. Some black students chose to attend former *de jure* white schools, but the plan had no significant effect on the former *de jure* black schools.

In 1968, we decided *Green* v. *School Bd. of New Kent County,* 391 U. S. 430. We held that adoption of a freedom of choice plan does not, by itself, satisfy a school district's mandatory responsibility to eliminate all vestiges of a dual system. *Green* was a turning point in our law in a further respect. Concerned by more than a decade of inaction, we stated that " '[t]he time for mere "deliberate speed" has run out.' " *Id.,* at 438, quoting *Griffin* v. *Prince Edward County School Bd.,* 377 U. S. 218, 234 (1964). We said that the obligation of school districts once segregated by law was to come forward with a plan that "promises realistically to work, and promises realistically to work *now.*" 391 U. S., at 439 (emphasis in original). The case before us requires an understanding and assessment of how DCSS responded to the directives set forth in *Green.*

Within two months of our ruling in *Green,* respondents, who are black schoolchildren and their parents, instituted this class action in the United States District Court for the Northern District of Georgia. After the suit was filed, DCSS voluntarily began working with the Department of Health, Education, and Welfare to devise a comprehensive and final plan of desegregation. The District Court, in June 1969, entered a consent order approving the proposed plan, which was to be implemented in the 1969–1970 school year. The order abolished the freedom of choice plan and adopted

a neighborhood school attendance plan that had been proposed by DCSS and accepted by the Department of Health, Education, and Welfare subject to a minor modification. Under the plan all of the former *de jure* black schools were closed, and their students were reassigned among the remaining neighborhood schools. The District Court retained jurisdiction.

Between 1969 and 1986, respondents sought only infrequent and limited judicial intervention into the affairs of DCSS. They did not request significant changes in student attendance zones or student assignment policies. In 1976, DCSS was ordered to expand its Majority-to-Minority (M-to-M) student transfer program, allowing students in a school where they are in the majority race to transfer to a school where they are in the minority; to establish a biracial committee to oversee the transfer program and future boundary line changes; and to reassign teachers so that the ratio of black to white teachers in each school would be, in substance, similar to the racial balance in the school population systemwide. From 1977 to 1979, the District Court approved a boundary line change for one elementary school attendance zone and rejected DCSS proposals to restrict the M-to-M transfer program. In 1983, DCSS was ordered to make further adjustments to the M-to-M transfer program.

In 1986, petitioners filed a motion for final dismissal of the litigation. They sought a declaration that DCSS had satisfied its duty to eliminate the dual education system, that is to say a declaration that the school system had achieved unitary status. *Green, supra,* at 441. The District Court approached the question whether DCSS had achieved unitary status by asking whether DCSS was unitary with respect to each of the factors identified in *Green.* The court considered an additional factor that is not named in *Green:* the quality of education being offered to the white and black student populations.

The District Court found DCSS to be "an innovative school system that has travelled the often long road to unitary status almost to its end," noting that "the court has continually been impressed by the successes of the DCSS and its dedication to providing a quality education for all students within that system." App. to Pet. for Cert. 71a. It found that DCSS is a unitary system with regard to student assignments, transportation, physical facilities, and extracurricular activities, and ruled that it would order no further relief in those areas. The District Court stopped short of dismissing the case, however, because it found that DCSS was not unitary in every respect. The court said that vestiges of the dual system remain in the areas of teacher and principal assignments, resource allocation, and quality of education. DCSS was ordered to take measures to address the remaining problems.

B

Proper resolution of any desegregation case turns on a careful assessment of its facts. *Green, supra,* at 439. Here, as in most cases where the issue is the degree of compliance with a school desegregation decree, a critical beginning point is the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole. This inquiry is fundamental, for under the former *de jure* regimes racial exclusion was both the means and the end of a policy motivated by disparagement of, or hostility towards, the disfavored race. In accord with this principle, the District Court began its analysis with an assessment of the current racial mix in the schools throughout DCSS and the explanation for the racial imbalance it found. Respondents did not contend on appeal that the findings of fact were clearly erroneous, and the Court of Appeals did not find them to be erroneous. The Court of Appeals did disagree with the conclusion reached

by the District Court respecting the need for further supervision of racial balance in student assignments.

In the extensive record that comprises this case, one fact predominates: Remarkable changes in the racial composition of the county presented DCSS and the District Court with a student population in 1986 far different from the one they set out to integrate in 1969. Between 1950 and 1985, DeKalb County grew from 70,000 to 450,000 in total population, but most of the gross increase in student enrollment had occurred by 1969, the relevant starting date for our purposes. Although the public school population experienced only modest changes between 1969 and 1986 (remaining in the low 70,000's), a striking change occurred in the racial proportions of the student population. The school system that the District Court ordered desegregated in 1969 had 5.6% black students; by 1986 the percentage of black students was 47%.

To compound the difficulty of working with these radical demographic changes, the northern and southern parts of the county experienced much different growth patterns. The District Court found that "[a]s the result of these demographic shifts, the population of the northern half of DeKalb County is now predominantly white and the southern half of DeKalb County is predominantly black." App. to Pet. for Cert. 38a. In 1970, there were 7,615 nonwhites living in the northern part of DeKalb County and 11,508 nonwhites in the southern part of the county. By 1980, there were 15,365 nonwhites living in the northern part of the county, and 87,583 nonwhites in the southern part. Most of the growth in the nonwhite population in the southern portion of the county was due to the migration of black persons from the city of Atlanta. Between 1975 and 1980 alone, approximately 64,000 black citizens moved into southern DeKalb County, most of them coming from Atlanta. During the same period, approximately 37,000 white citizens moved out of southern DeKalb County to the surrounding counties.

The District Court made findings with respect to the number of nonwhite citizens in the northern and southern parts of the county for the years 1970 and 1980 without making parallel findings with respect to white citizens. Yet a clear picture does emerge. During the relevant period, the black population in the southern portion of the county experienced tremendous growth while the white population did not, and the white population in the northern part of the county experienced tremendous growth while the black population did not.

The demographic changes that occurred during the course of the desegregation order are an essential foundation for the District Court's analysis of the current racial mix of DCSS. As the District Court observed, the demographic shifts have had "an immense effect on the racial compositions of the DeKalb County schools." *Ibid.* From 1976 to 1986, enrollment in elementary schools declined overall by 15%, while black enrollment in elementary schools increased by 86%. During the same period, overall high school enrollment declined by 16%, while black enrollment in high schools increased by 119%. These effects were even more pronounced in the southern portion of DeKalb County.

Concerned with racial imbalance in the various schools of the district, respondents presented evidence that during the 1986–1987 school year DCSS had the following features: (1) 47% of the students attending DCSS were black; (2) 50% of the black students attended schools that were over 90% black; (3) 62% of all black students attended schools that had more than 20% more blacks than the system-wide average; (4) 27% of white students attended schools that were more than 90% white; (5) 59% of the white students attended schools that had more than 20% more whites than the system-wide average; (6) of the 22 DCSS high schools, five had student populations that were more than 90% black, while five other schools had student populations that were more than 80% white; and (7) of the 74 elementary schools

in DCSS, 18 are over 90% black, while 10 are over 90% white. *Id.*, at 31a. (Respondents' evidence on these points treated all nonblack students as white. The District Court noted that there was no evidence that nonblack minority students constituted even 1% of DCSS student population.)

Respondents argued in the District Court that this racial imbalance in student assignment was a vestige of the dual system, rather than a product of independent demographic forces. In addition to the statistical evidence that the ratio of black students to white students in individual schools varied to a significant degree from the system-wide average, respondents contended that DCSS had not used all available desegregative tools in order to achieve racial balancing. Respondents pointed to the following alleged shortcomings in DCSS' desegregative efforts: (1) DCSS did not break the county into subdistricts and racially balance each subdistrict; (2) DCSS failed to expend sufficient funds for minority learning opportunities; (3) DCSS did not establish community advisory organizations; (4) DCSS did not make full use of the freedom of choice plan; (5) DCSS did not cluster schools, that is, it did not create schools for separate grade levels which could be used to establish a feeder pattern; (6) DCSS did not institute its magnet school program as early as it might have; and (7) DCSS did not use busing to facilitate urban to suburban exchanges.

According to the District Court, respondents conceded that the 1969 order assigning all students to their neighborhood schools "effectively desegregated the DCSS for a period of time" with respect to student assignment. *Id.*, at 35a. The District Court noted, however, that despite this concession respondents contended there was an improper imbalance in two schools even in 1969. Respondents made much of the fact that despite the small percentage of blacks in the county in 1969, there were then two schools that contained a majority of black students: Terry Mill Elementary School

was 76% black, and Stoneview Elementary School was 51% black.

The District Court found the racial imbalance in these schools was not a vestige of the prior *de jure* system. It observed that both the Terry Mill and Stoneview schools were *de jure* white schools before the freedom of choice plan was put in place. It cited expert witness testimony that Terry Mill had become a majority black school as a result of demographic shifts unrelated to the actions of petitioners or their predecessors. In 1966, the overwhelming majority of students at Terry Mill were white. By 1967, due to migration of black citizens from Atlanta into DeKalb County—and into the neighborhood surrounding the Terry Mill school in particular—23% of the students at Terry Mill were black. By 1968, black students constituted 50% of the school population at Terry Mill. By 1969, when the plan was put into effect, the percentage of black students had grown to 76. In accordance with the evidence of demographic shifts, and in the absence of any evidence to suggest that the former dual system contributed in any way to the rapid racial transformation of the Terry Mill student population, the District Court found that the pre-1969 unconstitutional acts of petitioners were not responsible for the high percentage of black students at the Terry Mill school in 1969. Its findings in this respect are illustrative of the problems DCSS and the District Court faced in integrating the whole district.

Although the District Court found that DCSS was desegregated for at least a short period under the court-ordered plan of 1969, it did not base its finding that DCSS had achieved unitary status with respect to student assignment on that circumstance alone. Recognizing that "[t]he achievement of unitary status in the area of student assignment cannot be hedged on the attainment of such status for a brief moment," *id.*, at 37a, the District Court examined the interaction between DCSS policy and demographic shifts in DeKalb County.

The District Court noted that DCSS had taken specific steps to combat the effects of demographics on the racial mix of the schools. Under the 1969 order, a biracial committee had reviewed all proposed changes in the boundary lines of school attendance zones. Since the original desegregation order, there had been about 170 such changes. It was found that only three had a partial segregative effect. An expert testified, and the District Court found, that even those changes had no significant effect on the racial mix of the school population, given the tremendous demographic shifts that were taking place at the same time.

The District Court also noted that DCSS, on its own initiative, started an M-to-M program in the 1972 school year. The program was a marked success. Participation increased with each passing year, so that in the 1986–1987 school year, 4,500 of the 72,000 students enrolled in DCSS participated. An expert testified that the impact of an M-to-M program goes beyond the number of students transferred because students at the receiving school also obtain integrated learning experiences. The District Court found that about 19% of the students attending DCSS had an integrated learning experience as a result of the M-to-M program. *Id.*, at 40a.

In addition, in the 1980's, DCSS instituted a magnet school program in schools located in the middle of the county. The magnet school programs included a performing arts program, two science programs, and a foreign language program. There was testimony in the District Court that DCSS also had plans to operate additional magnet programs in occupational education and gifted and talented education, as well as a preschool program and an open campus. By locating these programs in the middle of the county, DCSS sought to attract black students from the southern part of the county and white students from the northern part.

Further, the District Court found that DCSS operates a number of experience programs integrated by race, including

a writing center for fifth and seventh graders, a driving range, summer school programs, and a dialectical speech program. DCSS employs measures to control the racial mix in each of these special areas.

In determining whether DCSS has achieved unitary status with respect to student assignment, the District Court saw its task as one of deciding if petitioners "have accomplished maximum practical desegregation of the DCSS or if the DCSS must still do more to fulfill their affirmative constitutional duty." *Id.*, at 41a. Petitioners and respondents presented conflicting expert testimony about the potential effects that desegregative techniques not deployed might have had upon the racial mix of the schools. The District Court found that petitioners' experts were more reliable, citing their greater familiarity with DCSS, their experience, and their standing within the expert community. The District Court made these findings:

> "[The actions of DCSS] achieved maximum practical desegregation from 1969 to 1986. The rapid population shifts in DeKalb County were not caused by any action on the part of the DCSS. These demographic shifts were inevitable as the result of suburbanization, that is, work opportunities arising in DeKalb County as well as the City of Atlanta, which attracted blacks to DeKalb; the decline in the number of children born to white families during this period while the number of children born to black families did not decrease; blockbusting of formerly white neighborhoods leading to selling and buying of real estate in the DeKalb area on a highly dynamic basis; and the completion of Interstate 20, which made access from DeKalb County into the City of Atlanta much easier. . . . There is no evidence that the school system's previous unconstitutional conduct may have contributed to this segregation. This court is convinced that any further actions taken by defendants, while the actions might have made marginal adjustments in the

population trends, would not have offset the factors that were described above and the same racial segregation would have occurred at approximately the same speed." *Id.*, at 44a–45a.

The District Court added:

"[A]bsent massive bussing, which is not considered as a viable option by either the parties or this court, the magnet school program and the M-to-M program, which the defendants voluntarily implemented and to which the defendants obviously are dedicated, are the most effective ways to deal with the effects on student attendance of the residential segregation existing in DeKalb County at this time." *Id.*, at 46a.

Having found no constitutional violation with respect to student assignment, the District Court next considered the other *Green* factors, beginning with faculty and staff assignments. The District Court first found that DCSS had fulfilled its constitutional obligation with respect to hiring and retaining minority teachers and administrators. DCSS has taken active steps to recruit qualified black applicants and has hired them in significant numbers, employing a greater percentage of black teachers than the statewide average. The District Court also noted that DCSS has an "equally exemplary record" in retention of black teachers and administrators. App. to Pet. for Cert. 49a. Nevertheless, the District Court found that DCSS had not achieved or maintained a ratio of black to white teachers and administrators in each school to approximate the ratio of black to white teachers and administrators throughout the system. See *Singleton* v. *Jackson Municipal Separate School Dist.,* 419 F. 2d 1211 (CA5 1969), cert. denied, 396 U. S. 1032 (1970). In other words, a racial imbalance existed in the assignment of minority teachers and administrators. The District Court found that in the 1984–1985 school year, seven schools deviated by more than 10% from the system-wide average

of 26.4% minority teachers in elementary schools and 24.9% minority teachers in high schools. The District Court also found that black principals and administrators were over-represented in schools with high percentages of black students and underrepresented in schools with low percentages of black students.

The District Court found the crux of the problem to be that DCSS has relied on the replacement process to attain a racial balance in teachers and other staff and has avoided using mandatory reassignment. DCSS gave as its reason for not using mandatory reassignment that the competition among local school districts is stiff, and that it is difficult to attract and keep qualified teachers if they are required to work far from their homes. In fact, because teachers prefer to work close to their homes, DCSS has a voluntary transfer program in which teachers who have taught at the same school for a period of three years may ask for a transfer. Because most teachers request to be transferred to schools near their homes, this program makes compliance with the objective of racial balance in faculty and staff more difficult.

The District Court stated that it was not "unsympathetic to the difficulties that DCSS faces in this regard," but held that the law of the Circuit requires DCSS to comply with *Singleton.* App. to Pet. for Cert. 53a. The court ordered DCSS to devise a plan to achieve compliance with *Singleton,* noting that "[i]t would appear that such compliance will necessitate reassignment of both teachers and principals." App. to Pet. for Cert. 58a. With respect to faculty, the District Court noted that meeting *Singleton* would not be difficult, citing petitioners' own estimate that most schools' faculty could conform by moving, at most, two or three teachers.

Addressing the more ineffable category of quality of education, the District Court rejected most of respondents' contentions that there was racial disparity in the provision of certain educational resources (*e. g.,* teachers with advanced

degrees, teachers with more experience, library books), contentions made to show that black students were not being given equal educational opportunity. The District Court went further, however, and examined the evidence concerning achievement of black students in DCSS. It cited expert testimony praising the overall educational program in the district, as well as objective evidence of black achievement: Black students at DCSS made greater gains on the Iowa Tests of Basic Skills than white students, and black students at DCSS are more successful than black students nationwide on the Scholastic Aptitude Test. It made the following finding:

> "While there will always be something more that the DCSS can do to improve the chances for black students to achieve academic success, the court cannot find, as plaintiffs urge, that the DCSS has been negligent in its duties to implement programs to assist black students. The DCSS is a very innovative school system. It has implemented a number of programs to enrich the lives and enhance the academic potential of all students, both blacks and whites. Many remedial programs are targeted in the majority black schools. Programs have been implemented to involve the parents and offset negative socio-economic factors. If the DCSS has failed in any way in this regard, it is not because the school system has been negligent in its duties." App. to Pet. for Cert. 69a–70a (footnote omitted).

Despite its finding that there was no intentional violation, the District Court found that DCSS had not achieved unitary status with respect to quality of education because teachers in schools with disproportionately high percentages of white students tended to be better educated and have more experience than their counterparts in schools with disproportionately high percentages of black students, and because per-pupil expenditures in majority white schools

exceeded per-pupil expenditures in majority black schools. From these findings, the District Court ordered DCSS to equalize spending and remedy the other problems.

The final *Green* factors considered by the District Court were: (1) physical facilities, (2) transportation, and (3) extracurricular activities. The District Court noted that although respondents expressed some concerns about the use of portable classrooms in schools in the southern portion of the county, they in effect conceded that DCSS has achieved unitary status with respect to physical facilities.

In accordance with its factfinding, the District Court held that it would order no further relief in the areas of student assignment, transportation, physical facilities, and extracurricular activities. The District Court, however, did order DCSS to establish a system to balance teacher and principal assignments and to equalize per-pupil expenditures throughout DCSS. Having found that blacks were represented on the school board and throughout DCSS administration, the District Court abolished the biracial committee as no longer necessary.

Both parties appealed to the United States Court of Appeals for the Eleventh Circuit. The Court of Appeals affirmed the District Court's ultimate conclusion that DCSS has not yet achieved unitary status, but reversed the District Court's ruling that DCSS has no further duties in the area of student assignment. 887 F. 2d 1438 (1989). The Court of Appeals held that the District Court erred by considering the six *Green* factors as separate categories. The Court of Appeals rejected the District Court's incremental approach, an approach that has also been adopted by the Court of Appeals for the First Circuit, *Morgan* v. *Nucci*, 831 F. 2d 313, 318–319 (1987), and held that a school system achieves unitary status only after it has satisfied all six factors at the same time for several years. 887 F. 2d, at 1446. Because, under this test, DCSS had not achieved unitary status at any time, the Court of Appeals held that DCSS could "not shirk

its constitutional duties by pointing to demographic shifts occurring prior to unitary status." *Id.*, at 1448. The Court of Appeals held that petitioners bore the responsibility for the racial imbalance, and in order to correct that imbalance would have to take actions that "may be administratively awkward, inconvenient, and even bizarre in some situations," *Swann* v. *Charlotte-Mecklenburg Bd. of Education,* 402 U. S. 1, 28 (1971), such as pairing and clustering of schools, drastic gerrymandering of school zones, grade reorganization, and busing. We granted certiorari, 498 U. S. 1081 (1991).

## II

Two principal questions are presented. The first is whether a district court may relinquish its supervision and control over those aspects of a school system in which there has been compliance with a desegregation decree if other aspects of the system remain in noncompliance. As we answer this question in the affirmative, the second question is whether the Court of Appeals erred in reversing the District Court's order providing for incremental withdrawal of supervision in all the circumstances of this case.

## A

The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system. This is required in order to ensure that the principal wrong of the *de jure* system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present. This was the rationale and the objective of *Brown I* and *Brown II.* In *Brown I* we said: "To separate [black students] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U. S., at 494. We

quoted a finding of the three-judge District Court in the underlying Kansas case that bears repeating here:

> "'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.'" *Ibid.*

The objective of *Brown I* was made more specific by our holding in *Green* that the duty of a former *de jure* district is to "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U. S., at 437–438. We also identified various parts of the school system which, in addition to student attendance patterns, must be free from racial discrimination before the mandate of *Brown* is met: faculty, staff, transportation, extracurricular activities, and facilities. 391 U. S., at 435. The *Green* factors are a measure of the racial identifiability of schools in a system that is not in compliance with *Brown,* and we instructed the District Courts to fashion remedies that address all these components of elementary and secondary school systems.

The concept of unitariness has been a helpful one in defining the scope of the district courts' authority, for it conveys the central idea that a school district that was once a dual system must be examined in all of its facets, both when a remedy is ordered and in the later phases of desegregation when the question is whether the district courts' remedial control ought to be modified, lessened, or withdrawn. But, as we explained last Term in *Board of Ed. of Oklahoma City*

*Public Schools* v. *Dowell*, 498 U. S. 237, 245–246 (1991), the term "unitary" is not a precise concept:

> "[I]t is a mistake to treat words such as 'dual' and 'unitary' as if they were actually found in the Constitution. . . . Courts have used the terms 'dual' to denote a school system which has engaged in intentional segregation of students by race, and 'unitary' to describe a school system which has been brought into compliance with the command of the Constitution. We are not sure how useful it is to define these terms more precisely, or to create subclasses within them."

It follows that we must be cautious not to attribute to the term a utility it does not have. The term "unitary" does not confine the discretion and authority of the District Court in a way that departs from traditional equitable principles.

That the term "unitary" does not have fixed meaning or content is not inconsistent with the principles that control the exercise of equitable power. The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action. Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision. In this respect, as we observed in *Swann*, "a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." *Swann*, 402 U. S., at 15–16. The requirement of a unitary school system must be implemented according to this prescription.

Our application of these guiding principles in *Pasadena Bd. of Education* v. *Spangler*, 427 U. S. 424 (1976), is instructive. There we held that a District Court exceeded its remedial authority in requiring annual readjustment of school

attendance zones in the Pasadena school district when changes in the racial makeup of the schools were caused by demographic shifts "not attributed to any segregative acts on the part of the [school district]." *Id.*, at 436. In so holding we said:

"It may well be that petitioners have not yet totally achieved the unitary system contemplated by . . . *Swann.* There has been, for example, dispute as to the petitioners' compliance with those portions of the plan specifying procedures for hiring and promoting teachers and administrators. See 384 F. Supp. 846 (1974), vacated, 537 F. 2d 1031 (1976). But that does not undercut the force of the principle underlying the quoted language from *Swann.* In this case the District Court approved a plan designed to obtain racial neutrality in the attendance of students at Pasadena's public schools. No one disputes that the initial implementation of this plan accomplished *that* objective. That being the case, the District Court was not entitled to require the [Pasadena Unified School District] to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity. For having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." *Ibid.*

See also *id.*, at 438, n. 5 ("Counsel for the original plaintiffs has urged, in the courts below and before us, that the District Court's perpetual 'no majority of any minority' requirement was valid and consistent with *Swann*, at least until the school system achieved 'unitary' status in all other respects such as the hiring and promoting of teachers and administrators. Since we have concluded that the case is moot with

regard to these plaintiffs, these arguments are not properly before us. It should be clear from what we have said that they have little substance").

Today, we make explicit the rationale that was central in *Spangler*. A federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control. This discretion derives both from the constitutional authority which justified its intervention in the first instance and its ultimate objectives in formulating the decree. The authority of the court is invoked at the outset to remedy particular constitutional violations. In construing the remedial authority of the district courts, we have been guided by the principles that "judicial powers may be exercised only on the basis of a constitutional violation," and that "the nature of the violation determines the scope of the remedy." *Swann, supra,* at 16. A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation.

We have said that the court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution. *Milliken* v. *Bradley,* 433 U. S. 267, 280–281 (1977) ("[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution"). Partial relinquishment of judicial control, where justified by the facts of the case, can be an important and significant step in fulfilling the district court's duty to return the operations and control of schools to local authorities. In *Dowell*, we emphasized that federal judicial supervision of local school systems was intended as a "temporary measure." 498 U. S., at 247. Although this temporary measure has lasted decades, the ultimate objective has not changed—to return school districts to the control of local authorities. Just as a court has the obligation

at the outset of a desegregation decree to structure a plan
so that all available resources of the court are directed to
comprehensive supervision of its decree, so too must a court
provide an orderly means for withdrawing from control when
it is shown that the school district has attained the requisite
degree of compliance. A transition phase in which control
is relinquished in a gradual way is an appropriate means to
this end.

As we have long observed, "local autonomy of school dis-
tricts is a vital national tradition." *Dayton Bd. of Edu-
cation* v. *Brinkman*, 433 U. S. 406, 410 (1977) *(Dayton I)*.
Returning schools to the control of local authorities at the
earliest practicable date is essential to restore their true ac-
countability in our governmental system. When the school
district and all state entities participating with it in operat-
ing the schools make decisions in the absence of judicial su-
pervision, they can be held accountable to the citizenry, to
the political process, and to the courts in the ordinary course.
As we discuss below, one of the prerequisites to relinquish-
ment of control in whole or in part is that a school district
has demonstrated its commitment to a course of action that
gives full respect to the equal protection guarantees of the
Constitution. Yet it must be acknowledged that the poten-
tial for discrimination and racial hostility is still present in
our country, and its manifestations may emerge in new and
subtle forms after the effects of *de jure* segregation have
been eliminated. It is the duty of the State and its subdivi-
sions to ensure that such forces do not shape or control the
policies of its school systems. Where control lies, so too
does responsibility.

We hold that, in the course of supervising desegregation
plans, federal courts have the authority to relinquish super-
vision and control of school districts in incremental stages,
before full compliance has been achieved in every area of
school operations. While retaining jurisdiction over the
case, the court may determine that it will not order further

remedies in areas where the school district is in compliance with the decree. That is to say, upon a finding that a school system subject to a court-supervised desegregation plan is in compliance in some but not all areas, the court in appropriate cases may return control to the school system in those areas where compliance has been achieved, limiting further judicial supervision to operations that are not yet in full compliance with the court decree. In particular, the district court may determine that it will not order further remedies in the area of student assignments where racial imbalance is not traceable, in a proximate way, to constitutional violations.

A court's discretion to order the incremental withdrawal of its supervision in a school desegregation case must be exercised in a manner consistent with the purposes and objectives of its equitable power. Among the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

In considering these factors, a court should give particular attention to the school system's record of compliance. A school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations. And, with the passage of time, the degree to which racial imbalances continue to represent vestiges of a constitutional violation may dimin-

ish, and the practicability and efficacy of various remedies can be evaluated with more precision.

These are the premises that guided our formulation in *Dowell* of the duties of a district court during the final phases of a desegregation case: "The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." 498 U. S., at 249–250.

B

We reach now the question whether the Court of Appeals erred in prohibiting the District Court from returning to DCSS partial control over some of its affairs. We decide that the Court of Appeals did err in holding that, as a matter of law, the District Court had no discretion to permit DCSS to regain control over student assignment, transportation, physical facilities, and extracurricular activities, while retaining court supervision over the areas of faculty and administrative assignments and the quality of education, where full compliance had not been demonstrated.

It was an appropriate exercise of its discretion for the District Court to address the elements of a unitary system discussed in *Green*, to inquire whether other elements ought to be identified, and to determine whether minority students were being disadvantaged in ways that required the formulation of new and further remedies to ensure full compliance with the court's decree. Both parties agreed that quality of education was a legitimate inquiry in determining DCSS' compliance with the desegregation decree, and the trial court found it workable to consider the point in connection with its findings on resource allocation. Its order retaining supervision over this aspect of the case has not been challenged by the parties, and we need not examine it except as it underscores the school district's record of compliance in some areas but not others. The District Court's approach illustrates

that the *Green* factors need not be a rigid framework. It illustrates also the uses of equitable discretion. By withdrawing control over areas where judicial supervision is no longer needed, a district court can concentrate both its own resources and those of the school district on the areas where the effects of *de jure* discrimination have not been eliminated and further action is necessary in order to provide real and tangible relief to minority students.

The Court of Appeals' rejection of the District Court's order rests on related premises: first, that given noncompliance in some discrete categories, there can be no partial withdrawal of judicial control; and second, until there is full compliance, heroic measures must be taken to ensure racial balance in student assignments system wide. Under our analysis and our precedents, neither premise is correct.

The Court of Appeals was mistaken in ruling that our opinion in *Swann* requires "awkward," "inconvenient," and "even bizarre" measures to achieve racial balance in student assignments in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces. In *Swann* we undertook to discuss the objectives of a comprehensive desegregation plan and the powers and techniques available to a district court in designing it at the outset. We confirmed that racial balance in school assignments was a necessary part of the remedy in the circumstances there presented. In the case before us the District Court designed a comprehensive plan for desegregation of DCSS in 1969, one that included racial balance in student assignments. The desegregation decree was designed to achieve maximum practicable desegregation. Its central remedy was the closing of black schools and the reassignment of pupils to neighborhood schools, with attendance zones that achieved racial balance. The plan accomplished its objective in the first year of operation, before dramatic demographic changes altered residen-

tial patterns. For the entire 17-year period respondents raised no substantial objection to the basic student assignment system, as the parties and the District Court concentrated on other mechanisms to eliminate the *de jure* taint.

That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors. *Swann,* 402 U. S., at 31–32 ("Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary"). If the unlawful *de jure* policy of a school system has been the cause of the racial imbalance in student attendance, that condition must be remedied. The school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation.

The findings of the District Court that the population changes which occurred in DeKalb County were not caused by the policies of the school district, but rather by independent factors, are consistent with the mobility that is a distinct characteristic of our society. In one year (from 1987 to 1988) over 40 million Americans, or 17.6% of the total population,

moved households. U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 19 (111th ed. 1991) (Table 25). Over a third of those people moved to a different county, and over six million migrated between States. *Ibid.* In such a society it is inevitable that the demographic makeup of school districts, based as they are on political subdivisions such as counties and municipalities, may undergo rapid change.

The effect of changing residential patterns on the racial composition of schools, though not always fortunate, is somewhat predictable. Studies show a high correlation between residential segregation and school segregation. Wilson & Taeuber, Residential and School Segregation: Some Tests of Their Association, in Demography and Ethnic Groups 57–58 (F. Bean & W. Frisbie eds. 1978). The District Court in this case heard evidence tending to show that racially stable neighborhoods are not likely to emerge because whites prefer a racial mix of 80% white and 20% black, while blacks prefer a 50–50 mix.

Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once *de jure* segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.

In one sense of the term, vestiges of past segregation by state decree do remain in our society and in our schools. Past wrongs to the black race, wrongs committed by the State and in its name, are a stubborn fact of history. And stubborn facts of history linger and persist. But though we cannot escape our history, neither must we overstate its con-

sequences in fixing legal responsibilities. The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied. It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a *de jure* violation. And the law need not proceed on that premise.

As the *de jure* violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system. The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith. In light of its finding that the demographic changes in DeKalb County are unrelated to the prior violation, the District Court was correct to entertain the suggestion that DCSS had no duty to achieve system-wide racial balance in the student population. It was appropriate for the District Court to examine the reasons for the racial imbalance before ordering an impractical, and no doubt massive, expenditure of funds to achieve racial balance after 17 years of efforts to implement the comprehensive plan in a district where there were fundamental changes in demographics, changes not attributable to the former *de jure* regime or any later actions by school officials. The District Court's determination to order instead the expenditure of scarce resources in areas such as the quality of education, where full compliance had not yet been achieved, underscores the uses of discretion in framing equitable remedies.

To say, as did the Court of Appeals, that a school district must meet all six *Green* factors before the trial court can declare the system unitary and relinquish its control over school attendance zones, and to hold further that racial balancing by all necessary means is required in the interim, is

simply to vindicate a legal phrase. The law is not so formalistic. A proper rule must be based on the necessity to find a feasible remedy that ensures system-wide compliance with the court decree and that is directed to curing the effects of the specific violation.

We next consider whether retention of judicial control over student attendance is necessary or practicable to achieve compliance in other facets of the school system. Racial balancing in elementary and secondary school student assignments may be a legitimate remedial device to correct other fundamental inequities that were themselves caused by the constitutional violation. We have long recognized that the *Green* factors may be related or interdependent. Two or more *Green* factors may be intertwined or synergistic in their relation, so that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses other matters as well. We have observed, for example, that student segregation and faculty segregation are often related problems. See *Dayton Bd. of Education* v. *Brinkman*, 443 U. S. 526, 536 (1979) *(Dayton II)* ("'[P]urposeful segregation of faculty by race was inextricably tied to racially motivated student assignment practices'"); *Rogers* v. *Paul*, 382 U. S. 198, 200 (1965) (students have standing to challenge racial allocation of faculty because "racial allocation of faculty denies them equality of educational opportunity without regard to segregation of pupils"). As a consequence, a continuing violation in one area may need to be addressed by remedies in another. See, *e. g.*, *Bradley* v. *Richmond School Bd.*, 382 U. S. 103, 105 (1965) *(per curiam)* ("There is no merit to the suggestion that the relation between faculty allocation on an alleged racial basis and the adequacy of the desegregation plans is entirely speculative"); *Vaughns* v. *Board of Education of Prince George's County*, 742 F. Supp. 1275, 1291 (Md. 1990) ("[T]he components of

a school desegregation plan are interdependent upon, and interact with, one another, so that changes with respect to one component may impinge upon the success or failure of another").

There was no showing that racial balancing was an appropriate mechanism to cure other deficiencies in this case. It is true that the school district was not in compliance with respect to faculty assignments, but the record does not show that student reassignments would be a feasible or practicable way to remedy this defect. To the contrary, the District Court suggests that DCSS could solve the faculty assignment problem by reassigning a few teachers per school. The District Court, not having our analysis before it, did not have the opportunity to make specific findings and conclusions on this aspect of the case, however. Further proceedings are appropriate for this purpose.

The requirement that the school district show its good-faith commitment to the entirety of a desegregation plan so that parents, students, and the public have assurance against further injuries or stigma also should be a subject for more specific findings. We stated in *Dowell* that the good-faith compliance of the district with the court order over a reasonable period of time is a factor to be considered in deciding whether or not jurisdiction could be relinquished. 498 U. S., at 249–250 ("The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable"). A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future. See *Morgan* v. *Nucci*, 831

F. 2d, at 321 ("A finding of good faith . . . reduces the possibility that a school system's compliance with court orders is but a temporary constitutional ritual").

When a school district has not demonstrated good faith under a comprehensive plan to remedy ongoing violations, we have without hesitation approved comprehensive and continued district court supervision. See *Columbus Bd. of Education* v. *Penick,* 443 U. S. 449, 461 (1979) (predicating liability in part on the finding that the school board " 'never actively set out to dismantle [the] dual system,' " *Penick* v. *Columbus Bd. of Education,* 429 F. Supp. 229, 260 (SD Ohio 1977)); *Dayton II, supra,* at 534 (adopting Court of Appeals holding that the "intentionally segregative impact of various practices since 1954 . . . were of systemwide import and an appropriate basis for a systemwide remedy").

In contrast to the circumstances in *Penick* and *Brinkman,* the District Court in this case stated that throughout the period of judicial supervision it has been impressed by the successes DCSS has achieved and its dedication to providing a quality education for all students, and that DCSS "has travelled the often long road to unitary status almost to its end." With respect to those areas where compliance had not been achieved, the District Court did not find that DCSS had acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect. This, though, may not be the equivalent of a finding that the school district has an affirmative commitment to comply in good faith with the entirety of a desegregation plan, and further proceedings are appropriate for this purpose as well.

The judgment is reversed, and the case is remanded to the Court of Appeals. It should determine what issues are open for its further consideration in light of the previous briefs and arguments of the parties and in light of the principles set forth in this opinion. Thereupon it should order further

proceedings as necessary or order an appropriate remand to the District Court.

Each party is to bear its own costs.

*It is so ordered.*

JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE SCALIA, concurring.

The District Court in the present case found that the imbalances in student assignment were attributable to private demographic shifts rather than governmental action. Without disturbing this finding, and without finding that revision of student assignments was necessary to remedy some other unlawful government action, the Court of Appeals ordered DeKalb County to institute massive busing and other programs to achieve integration. The Court convincingly demonstrates that this cannot be reconciled with our cases, and I join its opinion.

Our decision will be of great assistance to the citizens of DeKalb County, who for the first time since 1969 will be able to run their own public schools, at least so far as student assignments are concerned. It will have little effect, however, upon the many other school districts throughout the country that are still being supervised by federal judges, since it turns upon the extraordinarily rare circumstance of a *finding* that no portion of the current racial imbalance is a remnant of prior *de jure* discrimination. While it is perfectly appropriate for the Court to decide this case on that narrow basis, we must resolve—if not today, then soon— what is to be done in the vast majority of other districts, where, though our cases continue to profess that judicial oversight of school operations is a temporary expedient, democratic processes remain suspended, with no prospect of restoration, 38 years after *Brown* v. *Board of Education,* 347 U. S. 483 (1954).

Almost a quarter century ago, in *Green* v. *School Bd. of New Kent County*, 391 U. S. 430, 437–438 (1968), this Court held that school systems which had been enforcing *de jure* segregation at the time of *Brown* had not merely an obligation to assign students and resources on a race-neutral basis but also an "affirmative duty" to "desegregate," that is, to achieve insofar as practicable racial balance in their schools. This holding has become such a part of our legal fabric that there is a tendency, reflected in the Court of Appeals opinion in this case, to speak as though the Constitution requires such racial balancing. Of course it does not: The Equal Protection Clause reaches only those racial imbalances shown to be intentionally caused by the State. As the Court reaffirms today, if "desegregation" (*i. e.*, racial balancing) were properly to be ordered in the present case, it would be not because the extant racial imbalance in the DeKalb County School System offends the Constitution, but rather because that imbalance is a "lingering effect" of the pre-1969 *de jure* segregation that offended the Constitution. For all our talk about "unitary status," "release from judicial supervision," and "affirmative duty to desegregate," the sole question in school desegregation cases (absent an allegation that current policies are intentionally discriminatory) is one of remedies for past violations.

Identifying and undoing the effects of some violations of the law is easy. Where, for example, a tax is found to have been unconstitutionally imposed, calculating the funds derived from that tax (which must be refunded), and distinguishing them from the funds derived from other taxes (which may be retained), is a simple matter. That is not so with respect to the effects of unconstitutionally operating a legally segregated school system; they are uncommonly difficult to identify and to separate from the effects of other causes. But one would not know that from our instructions to the lower courts on this subject, which tend to be at a level of generality that assumes facile reduction to specifics.

"'[Desegregation] decrees,'" we have said, "'exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation,'" *Board of Education of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 247 (1991); *Milliken* v. *Bradley*, 433 U. S. 267, 282 (1977). We have never sought to describe how one identifies a condition as the effluent of a violation, or how a "vestige" or a "remnant" of past discrimination is to be recognized. Indeed, we have not even betrayed an awareness that these tasks are considerably more difficult than calculating the amount of taxes unconstitutionally paid. It is time for us to abandon our studied disregard of that obvious truth and to adjust our jurisprudence to its reality.

Since parents and school boards typically want children to attend schools in their own neighborhood, "[t]he principal cause of racial and ethnic imbalance in . . . public schools across the country—North and South—is the imbalance in residential patterns." *Austin Independent School Dist.* v. *United States*, 429 U. S. 990, 994 (1976) (Powell, J., concurring). That imbalance in residential patterns, in turn, "doubtless result[s] from a mélange of past happenings prompted by economic considerations, private discrimination, discriminatory school assignments, or a desire to reside near people of one's own race or ethnic background." *Columbus Bd. of Education* v. *Penick*, 443 U. S. 449, 512 (1979) (REHNQUIST, J., dissenting); see also *Pasadena Bd. of Education* v. *Spangler*, 427 U. S. 424, 435–437 (1976). Consequently, residential segregation "is a national, not a southern[,] phenomenon" which exists "'regardless of the character of local laws and policies, and regardless of the extent of other forms of segregation or discrimination.'" *Keyes* v. *School Dist. No. 1, Denver*, 413 U. S. 189, 223, and n. 9 (1973) (Powell, J., concurring in part and dissenting in part), quoting K. Taeuber, Negroes in Cities 36 (1965).

Racially imbalanced schools are hence the product of a blend of public and private actions, and any assessment that they would not be segregated, or would not be *as* segregated, in the absence of a particular one of those factors is guesswork. It is similarly guesswork, of course, to say that they *would* be segregated, or would be *as* segregated, in the absence of one of those factors. Only in rare cases such as this one and *Spangler,* see 427 U. S., at 435–437, where the racial imbalance had been temporarily corrected after the abandonment of *de jure* segregation, can it be asserted with any degree of confidence that the past discrimination is no longer playing a proximate role. Thus, allocation of the burden of proof foreordains the result in almost all of the "vestige of past discrimination" cases. If, as is normally the case under our equal protection jurisprudence (and in the law generally), we require the plaintiffs to establish the asserted facts entitling them to relief—that the racial imbalance they wish corrected is at least in part the vestige of an old *de jure* system—the plaintiffs will almost always lose. Conversely, if we alter our normal approach and require the school authorities to establish the negative—that the imbalance is *not* attributable to their past discrimination—the plaintiffs will almost always win. See *Penick, supra,* at 471 (Stewart, J., concurring in result).

Since neither of these alternatives is entirely palatable, an observer unfamiliar with the history surrounding this issue might suggest that we avoid the problem by requiring only that the school authorities establish a regime in which parents are free to disregard neighborhood-school assignment, and to send their children (with transportation paid) to whichever school they choose. So long as there is free choice, he would say, there is no reason to require that the schools be made identical. The constitutional right is equal racial access to schools, not access to racially equal schools; whatever racial imbalances such a free-choice system might produce would be the product of private forces. We appar-

ently envisioned no more than this in our initial post-*Brown* cases.* It is also the approach we actually adopted in *Bazemore* v. *Friday,* 478 U. S. 385, 407–409 (1986) (WHITE, J., concurring), which concerned remedies for prior *de jure* segregation of state university-operated clubs and services.

But we ultimately charted a different course with respect to public elementary and secondary schools. We concluded in *Green* that a "freedom of choice" plan was not necessarily sufficient, 391 U. S., at 439–440, and later applied this conclusion to all jurisdictions with a history of intentional segregation:

> " 'Racially neutral' assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a 'loaded game board,' affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments." *Swann* v. *Charlotte-Mecklenburg Bd. of Education,* 402 U. S. 1, 28 (1971).

---

*See, *e. g., Cooper* v. *Aaron,* 358 U. S. 1, 7 (1958) ("[O]bedience to the duty of desegregation would require the immediate general admission of Negro children . . . at particular schools"); *Goss* v. *Board of Education of Knoxville,* 373 U. S. 683, 687 (1963) (holding unconstitutional a minority-to-majority transfer policy which was unaccompanied by a policy allowing majority-to-minority transfers, but noting that "if the transfer provisions were made available to all students regardless of their race and regardless as well of the racial composition of the school to which he requested transfer we would have an entirely different case. Pupils could then at their option (or that of their parents) choose, entirely free of any imposed racial considerations, to remain in the school of their zone or transfer to another").

Thus began judicial recognition of an "affirmative duty" to desegregate, *id.*, at 15; *Green, supra,* at 437–438, achieved by allocating the burden of negating causality to the defendant. Our post-*Green* cases provide that, once state-enforced school segregation is shown to have existed in a jurisdiction in 1954, there arises a presumption, effectively irrebuttable (because the school district cannot prove the negative), that any current racial imbalance is the product of that violation, at least if the imbalance has continuously existed, see, *e. g., Swann, supra,* at 26; *Keyes,* 413 U. S., at 209–210.

In the context of elementary and secondary education, the presumption was extraordinary in law but not unreasonable in fact. "Presumptions normally arise when proof of one fact renders the existence of another fact 'so probable that it is sensible and timesaving to assume the truth of [the inferred] fact . . . until the adversary disproves it.'" *NLRB* v. *Curtin Matheson Scientific, Inc.,* 494 U. S. 775, 788–789 (1990), quoting E. Cleary, McCormick on Evidence § 343, p. 969 (3d ed. 1984). The extent and recency of the prior discrimination, and the improbability that young children (or their parents) would use "freedom of choice" plans to disrupt existing patterns "warrant[ed] a presumption [that] schools that are substantially disproportionate in their racial composition" were remnants of the *de jure* system. *Swann, supra,* at 26.

But granting the merits of this approach at the time of *Green,* it is now 25 years later. "From the very first, federal supervision of local school systems was intended as a *temporary* measure to remedy past discrimination." *Dowell,* 498 U. S., at 247 (emphasis added). We envisioned it as temporary partly because "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools," *Milliken* v. *Bradley,* 418 U. S. 717, 741 (1974) *(Milliken I),* and because no one's interest is furthered by subjecting the Nation's educational system to "judicial tutelage for the indefinite future," *Dowell, supra,* at 249; see also

*Dayton Bd. of Education* v. *Brinkman,* 433 U. S. 406, 410 (1977); *Spangler* v. *Pasadena City Bd. of Education,* 611 F. 2d 1239, 1245, n. 5 (CA9 1979) (Kennedy, J., concurring). But we also envisioned it as temporary, I think, because the rational basis for the extraordinary presumption of causation simply must dissipate as the *de jure* system and the school boards who produced it recede further into the past. Since a multitude of private factors has shaped school systems in the years after abandonment of *de jure* segregation—normal migration, population growth (as in this case), "white flight" from the inner cities, increases in the costs of new facilities— the percentage of the current makeup of school systems attributable to the prior, government-enforced discrimination has diminished with each passing year, to the point where it cannot realistically be assumed to be a significant factor.

At some time, we must acknowledge that it has become absurd to assume, without any further proof, that violations of the Constitution dating from the days when Lyndon Johnson was President, or earlier, continue to have an appreciable effect upon current operation of schools. We are close to that time. While we must continue to prohibit, without qualification, all racial discrimination in the operation of public schools, and to afford remedies that eliminate not only the discrimination but its identified consequences, we should consider laying aside the extraordinary, and increasingly counterfactual, presumption of *Green.* We must soon revert to the ordinary principles of our law, of our democratic heritage, and of our educational tradition: that plaintiffs alleging equal protection violations must prove intent and causation and not merely the existence of racial disparity, see *Bazemore, supra,* at 407–409 (WHITE, J., concurring); *Washington* v. *Davis,* 426 U. S. 229, 245 (1976); that public schooling, even in the South, should be controlled by locally elected authorities acting in conjunction with parents, see, *e. g., Dowell, supra,* at 248; *Dayton, supra,* at 410; *Milliken I, supra,* at

741–742; and that it is "desirable" to permit pupils to attend "schools nearest their homes," *Swann*, 402 U. S., at 28.

JUSTICE SOUTER, concurring.

I join the Court's opinion holding that where there are vestiges of a dual system in some of a judicially supervised school system's aspects, or *Green*-type factors,* a district court will retain jurisdiction over the system, but need not maintain constant supervision or control over factors as to which compliance has been achieved. I write separately only to explain my understanding of the enquiry required by a district court applying the principle we set out today.

We recognize that although demographic changes influencing the composition of a school's student population may well have no causal link to prior *de jure* segregation, judicial control of student assignments may still be necessary to remedy persisting vestiges of the unconstitutional dual system, such as remaining imbalance in faculty assignments. See *ante*, at 497–498. This is, however, only one of several possible causal relationships between or among unconstitutional acts of school segregation and various *Green*-type factors. I think it is worth mentioning at least two others: the dual school system itself as a cause of the demographic shifts with which the district court is faced when considering a partial relinquishment of supervision, and a *Green*-type factor other than student assignments as a possible cause of imbalanced student assignment patterns in the future.

The first would occur when demographic change toward segregated residential patterns is itself caused by past school segregation and the patterns of thinking that segregation creates. Such demographic change is not an independent, supervening cause of racial imbalance in the student body, and we have said before that when demographic change is

---

*Green* v. *School Bd. of New Kent County,* 391 U. S. 430 (1968). *Green's* list of specific factors, of course, need not be treated as exclusive. See *ante,* at 492–493.

not independent of efforts to segregate, the causal relationship may be considered in fashioning a school desegregation remedy. See *Swann* v. *Charlotte-Mecklenburg Bd. of Education*, 402 U. S. 1, 21 (1971). Racial imbalance in student assignments caused by demographic change is not insulated from federal judicial oversight where the demographic change is itself caused in this way, and before deciding to relinquish supervision and control over student assignments, a district court should make findings on the presence or absence of this relationship.

The second and related causal relationship would occur after the district court has relinquished supervision over a remedied aspect of the school system, when future imbalance in that remedied *Green*-type factor (here, student assignments) would be caused by remaining vestiges of the dual system. Even after attaining compliance as to student composition, other factors such as racial composition of the faculty, quality of the physical plant, or per-pupil expenditures may leave schools racially identifiable. (In this very case, for example, there is a correlation in particular schools of overrepresentation of black principals and administrators, lower per-pupil expenditures, and high percentages of black students. Moreover, the schools in the predominantly black southern section of the school district are the only ones that use "portable classrooms," *i. e.*, trailers. See *ante*, at 481–482, 484.) If such other factors leave a school identifiable as "black," as soon as the district court stops supervising student assignments, nearby white parents may move in the direction of racially identifiable "white" schools, or may simply move their children into these schools. In such a case, the vestige of discrimination in one factor will act as an incubator for resegregation in others. Before a district court ends its supervision of student assignments, then, it should make a finding that there is no immediate threat of unremedied *Green*-type factors causing population or student enrollment changes that in turn may imbalance student composi-

tion in this way. And, because the district court retains jurisdiction over the case, it should of course reassert control over student assignments if it finds that this does happen.

JUSTICE BLACKMUN, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, concurring in the judgment.

It is almost 38 years since this Court decided *Brown* v. *Board of Education*, 347 U. S. 483 (1954). In those 38 years the students in DeKalb County, Ga., never have attended a desegregated school system even for one day. The majority of "black" students never have attended a school that was not disproportionately black. Ignoring this glaring dual character of the DeKalb County School System (DCSS), part "white" and part "black," the District Court relinquished control over student assignments, finding that the school district had achieved "unitary status" in that aspect of the system. No doubt frustrated by the continued existence of duality, the Court of Appeals ordered the school district to take extraordinary measures to correct all manifestations of this racial imbalance. Both decisions, in my view, were in error, and I therefore concur in the Court's decision to vacate the judgment and remand the case.

I also am in agreement with what I consider to be the holdings of the Court. I agree that in some circumstances the District Court need not interfere with a particular portion of the school system, even while, in my view, it must retain jurisdiction over the entire system until all vestiges of state-imposed segregation have been eliminated. See *ante*, at 490–491. I also agree that whether the District Court must order DCSS to balance student assignments depends on whether the current imbalance is traceable to unlawful state policy and on whether such an order is necessary to fashion an effective remedy. See *ante*, at 491, 493–494, 497–498. Finally, I agree that the good faith of the school board is relevant to these inquiries. See *ante*, at 498–499.

I write separately for two purposes. First, I wish to be precise about my understanding of what it means for the District Court in this case to retain jurisdiction while relinquishing "supervision and control" over a subpart of a school system under a desegregation decree. Second, I write to elaborate on factors the District Court should consider in determining whether racial imbalance is traceable to board actions and to indicate where, in my view, it failed to apply these standards.

I

Beginning with *Brown*, and continuing through the Court's most recent school-desegregation decision in *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237 (1991), this Court has recognized that when the local government has been running *de jure* segregated schools, it is the operation of a racially segregated school *system* that must be remedied, not discriminatory policy in some discrete subpart of that system. Consequently, the Court in the past has required, and decides again today, that even if the school system ceases to discriminate with respect to one of the *Green*-type factors, "the [district] court should retain jurisdiction until it is clear that state-imposed segregation has been *completely removed*." *Green* v. *School Bd. of New Kent County*, 391 U. S. 430, 439 (1968) (emphasis added); *Raney* v. *Board of Ed. of Gould School Dist.*, 391 U. S. 443, 449 (1968); see *ante*, at 491.

That the District Court's jurisdiction should continue until the school board demonstrates full compliance with the Constitution follows from the reasonable skepticism that underlies judicial supervision in the first instance. This Court noted in *Dowell:* "A district court need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future." 498 U. S., at 249. It makes little sense, it seems to me, for the court to disarm itself by renouncing jurisdiction in one aspect of a school system, while violations of the Equal Protec-

tion Clause persist in other aspects of the same system. Cf. *Keyes* v. *School Dist. No. 1, Denver,* 413 U. S. 189, 207 (1973). It would seem especially misguided to place unqualified reliance on the school board's promises in this case, because the two areas of the school system the District Court found still in violation of the Constitution—expenditures and teacher assignments—are two of the *Green* factors over which DCSS exercises the greatest control.

The obligations of a district court and a school district under its jurisdiction have been clearly articulated in the Court's many desegregation cases. Until the desegregation decree is dissolved under the standards set forth in *Dowell,* the school board continues to have "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green,* 391 U. S., at 437–438. The duty remains enforceable by the district court without any new proof of a constitutional violation, and the school district has the burden of proving that its actions are eradicating the effects of the former *de jure* regime. See *Dayton Board of Education* v. *Brinkman,* 443 U. S. 526, 537 (1979); *Keyes,* 413 U. S., at 208–211; *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 26 (1971); *Green,* 391 U. S., at 439.

Contrary to the Court of Appeals' conclusion, however, retaining jurisdiction does not obligate the district court in all circumstances to maintain active supervision and control, continually ordering reassignment of students. The "duty" of the district court is to guarantee that the school district "'eliminate[s] the discriminatory effects of the past as well as to bar like discrimination in the future.'" *Green,* 391 U. S., at 438, n. 4. This obligation requires the court to review school-board actions to ensure that each one "will further rather than delay conversion to a unitary, nonracial nondiscriminatory school system." *Monroe* v. *Board of Comm'rs of Jackson,* 391 U. S. 450, 459 (1968); see also *Dayton Board of Education,* 443 U. S., at 538; *United States* v.

*Scotland Neck Board of Education,* 407 U. S. 484, 489 (1972). But this obligation does not always require the district court to order new, affirmative action simply because of racial imbalance in student assignment.

Whether a district court must maintain active supervision over student assignment, and order new remedial actions, depends on two factors. As the Court discusses, the district court must order changes in student assignment if it "is necessary or practicable to achieve compliance in other facets of the school system." *Ante,* at 497; see also *ante,* at 507 (SOUTER, J., concurring). The district court also must order affirmative action in school attendance if the school district's conduct was a "contributing cause" of the racially identifiable schools. *Columbus Board of Education* v. *Penick,* 443 U. S. 449, 465, n. 13 (1979); see also *Keyes,* 413 U. S., at 211, and n. 17 (the school board must prove that its conduct "did not create or contribute to" the racial identifiability of schools or that racially identifiable schools are "in no way the result of" school board action). It is the application of this latter causation requirement that I now examine in more detail.

## II

### A

DCSS claims that it need not remedy the segregation in DeKalb County schools because it was caused by demographic changes for which DCSS has no responsibility. It is not enough, however, for DCSS to establish that demographics exacerbated the problem; it must prove that its own policies did not contribute.[1] Such contribution can occur in at

---

[1] The Court's cases make clear that there is a presumption in a former *de jure* segregated school district that the board's actions caused the racially identifiable schools, and it is the school board's obligation to rebut that presumption. See *Dayton Board of Education* v. *Brinkman,* 443 U. S. 526, 537 (1979); *Keyes* v. *School Dist. No. 1, Denver,* 413 U. S. 189, 208, 211 (1973); *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 26 (1971); *ante,* at 494–495.

least two ways: DCSS may have contributed to the demographic changes themselves, or it may have contributed directly to the racial imbalance in the schools.

To determine DCSS' possible role in encouraging the residential segregation, the court must examine the situation with special care. "[A] connection between past segregative acts and present segregation may be present even when not apparent and . . . close examination is required before concluding that the connection does not exist." *Keyes,* 413 U. S., at 211. Close examination is necessary because what might seem to be purely private preferences in housing may in fact have been created, in part, by actions of the school district.

> "People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods." *Swann,* 402 U. S., at 20–21.

This interactive effect between schools and housing choices may occur because many families are concerned about the racial composition of a prospective school and will make residential decisions accordingly.[2] Thus, schools that are demonstrably black or white provide a signal to these families, perpetuating and intensifying the residential movement. See *Keyes,* 413 U. S., at 202; *Columbus Board of Education,* 443 U. S., at 465, n. 13; *ante,* at 507–508 (SOUTER, J., concurring).

School systems can identify a school as "black" or "white" in a variety of ways; choosing to enroll a racially identifiable

---

[2] See Taeuber, Housing, Schools, and Incremental Segregative Effects, 441 Annals Am. Acad. Pol. & Soc. Sci. 157 (1979); Orfield, School Segregation and Residential Segregation, in School Desegregation: Past, Present, and Future 227, 234–237 (W. Stephan & J. Feagin eds. 1980); Elam, The 22nd Annual Gallup Poll of Public's Attitudes Toward the Public Schools, 72 Phi Delta Kappan 41, 44–45 (1990).

student population is only the most obvious. The Court has noted: "[T]he use of mobile classrooms, the drafting of student transfer policies, the transportation of students, and the assignment of faculty and staff, on racially identifiable bases, have the clear effect of earmarking schools according to their racial composition." *Keyes,* 413 U. S., at 202. Because of the various methods for identifying schools by race, even if a school district manages to desegregate student assignments at one point, its failure to remedy the constitutional violation in its entirety may result in resegregation, as neighborhoods respond to the racially identifiable schools. See *ante,* at 508–509 (SOUTER, J., concurring). Regardless of the particular way in which the school district has encouraged residential segregation, this Court's decisions require that the school district remedy the effect that such segregation has had on the school system.

In addition to exploring the school district's influence on residential segregation, the District Court here should examine whether school-board actions might have contributed to school segregation. Actions taken by a school district can aggravate or eliminate school segregation independent of residential segregation. School-board policies concerning placement of new schools and closure of old schools and programs such as magnet classrooms and majority-to-minority (M-to-M) transfer policies affect the racial composition of the schools. See *Swann,* 402 U. S., at 20–21, 26–27. A school district's failure to adopt policies that effectively desegregate its schools continues the violation of the Fourteenth Amendment. See *Columbus Board of Education,* 443 U. S., at 458–459; *Dayton Board of Education,* 443 U. S., at 538. The Court many times has noted that a school district is not responsible for all of society's ills, but it bears full responsibility for schools that have never been desegregated. See, *e. g., Swann, supra.*

## B

The District Court's opinion suggests that it did not examine DCSS' actions in light of the foregoing principles. The court did note that the migration farther into the suburbs was accelerated by "white flight" from black schools and the "blockbusting" of former white neighborhoods. It did not examine, however, whether DCSS might have encouraged that flight by assigning faculty and principals so as to identify some schools as intended respectively for black students or white students. See App. 226–231. Nor did the court consider how the placement of schools, the attendance zone boundaries, or the use of mobile classrooms might have affected residential movement. The court, in my view, failed to consider the many ways DCSS may have contributed to the demographic shifts.

Nor did the District Court correctly analyze whether DCSS' past actions had contributed to the school segregation independent of residential segregation. The court did not require DCSS to bear the "heavy burden" of showing that student assignment policies—policies that continued the effects of the dual system—served important and legitimate ends. See *Dayton Board of Education,* 443 U. S., at 538; *Swann,* 402 U. S., at 26. Indeed, the District Court said flatly that it would "not dwell on what might have been," but would inquire only as to "what else should be done now." App. 221. But this Court's decisions *require* the District Court to "dwell on what might have been." In particular, they require the court to examine the past to determine whether the current racial imbalance in the schools is attributable in part to the former *de jure* segregated regime or any later actions by school officials.

As the Court describes, the District Court placed great emphasis on its conclusion that DCSS, in response to the court order, had desegregated student assignment in 1969. DCSS' very first action taken in response to the court decree, however, was to shape attendance zones to result

in two schools that were more than 50% black, despite a district-wide black student population of less than 6%. See *ante,* at 477–478. Within a year, another school became majority black, followed by four others within the next two years. App. 304, 314, 350, 351, 368. Despite the existence of these schools, the District Court found that DCSS effectively had desegregated for a short period of time with respect to student assignment. See *ante,* at 478. The District Court justified this finding by linking the school segregation exclusively to residential segregation existing prior to the court order. See *ibid.*

But residential segregation that existed *prior* to the desegregation decree cannot provide an excuse. It is not enough that DCSS adopt race-neutral policies in response to a court desegregation decree. Instead, DCSS is obligated to "counteract the continuing effects of past school segregation." *Swann,* 402 U. S., at 28. Accordingly, the school district did not meet its affirmative duty simply by adopting a neighborhood-school plan, when already existing residential segregation inevitably perpetuated the dual system. See *Davis* v. *Board of School Comm'rs of Mobile County,* 402 U. S. 33, 37 (1971); *Swann,* 402 U. S., at 25–28, 30.

Virtually all the demographic changes that DCSS claims caused the school segregation occurred after 1975. See *ante,* at 475; App. 215, 260. Of particular relevance to the causation inquiry, then, are DCSS' actions prior to 1975; failures during that period to implement the 1969 decree render the school district's contentions that its noncompliance is due simply to demographic changes less plausible.

A review of the record suggests that from 1969 until 1975, DCSS failed to desegregate its schools. During that period, the number of students attending racially identifiable schools actually increased, and increased more quickly than the increase in black students. By 1975, 73% of black elementary students and 56% of black high school students were attending majority black schools, although the percentages of black

students in the district population were just 20% and 13%, respectively. *Id.*, at 269–380.

Of the 13 new elementary schools DCSS opened between 1969 and 1975, 6 had a total of four black students in 1975. *Id.*, at 272, 299, 311, 316, 337, 353. One of the two high schools DCSS opened had no black students at all.[3] *Id.*, at 367, 361. The only other measure taken by DCSS during the 1969–1975 period was to adopt the M-to-M transfer program in 1972. Due, however, to limitations imposed by school-district administrators—including a failure to provide transportation, "unnecessary red tape," and limits on available transfer schools—only one-tenth of 1% of the students were participating in the transfer program as of the 1975–1976 school year. *Id.*, at 75, 80.

In 1976, when the District Court reviewed DCSS' actions in the M-to-M program, it concluded that DCSS' limitations on the program "perpetuate the vestiges of a dual system." *Id.*, at 83. Noting that the Department of Health, Education, and Welfare had found that DCSS had ignored its responsibility affirmatively to eradicate segregation and perpetuate desegregation, the District Court found that attendance zone changes had perpetuated the dual system in the county. *Id.*, at 89, 91.

Thus, in 1976, before most of the demographic changes, the District Court found that DCSS had not complied with the 1969 order to eliminate the vestiges of its former *de jure* school system. Indeed, the 1976 order found that DCSS had contributed to the growing racial imbalance of its schools. Given these determinations in 1976, the District Court, at a minimum, should have required DCSS to prove that, but for the demographic changes between 1976 and 1985, its actions would have been sufficient to "convert promptly to a system without a 'white' school and a 'Negro' school, but just

---

[3] By 1986, one of those two high schools was 2.4% black. The other was 91.7% black. Of the 13 elementary schools, 8 were either virtually all black or all white and all were racially identifiable. App. 269–359.

schools." *Green,* 391 U. S., at 442. The available evidence suggests that this would be a difficult burden for DCSS to meet.

DCSS has undertaken only limited remedial actions since the 1976 court order. The number of students participating in the M-to-M program has expanded somewhat, composing about 6% of the current student population. The district also has adopted magnet programs, but they involve fewer than 1% of the system's students. Doubtless DCSS could have started and expanded its magnet and M-to-M programs more promptly; it could have built and closed schools with a view toward promoting integration of both schools and neighborhoods; redrawn attendance zones; integrated its faculty and administrators; and spent its funds equally. But it did not. DCSS must prove that the measures it actually implemented satisfy its obligation to eliminate the vestiges of *de jure* segregation originally discovered in 1969, and still found to exist in 1976.

### III

The District Court apparently has concluded that DCSS should be relieved of the responsibility to desegregate because such responsibility would be burdensome. To be sure, changes in demographic patterns aggravated the vestiges of segregation and made it more difficult for DCSS to desegregate. But an integrated school system is no less desirable because it is difficult to achieve, and it is no less a constitutional imperative because that imperative has gone unmet for 38 years.

Although respondents challenged the District Court's causation conclusions in the Court of Appeals, that court did not reach the issue. Accordingly, in addition to the issues the Court suggests be considered in further proceedings, I would remand for the Court of Appeals to review, under the foregoing principles, the District Court's finding that DCSS has met its burden of proving the racially identifiable schools are in no way the result of past segregative action.