Kalima JENKINS, by her friend, Kamau AGYEI; Carolyn Dawson, by her next friend Richard Dawson, Tufanza A. Byrd, by her next friend, Teresa Byrd; Derek A. Dydell; Terrance Cason, by his next friend, Antoria Cason; Jonathan Wiggins, by his next friend, Rosemary Jacobs Love; Kirk Allan Ward, by his next friend, Mary Ward, Plaintiffs–Appellants,

Robert M. Hall, by his next friend, Denise Hall, Plaintiff,

Dwayne A. Turrentine, by his next friend, Sheila Turrentine; Gregory A. Pugh, by his next friend, David Winters, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

American Federation of Teachers, Local 691, Intervenor–Appellee,

v.

STATE OF MISSOURI; Mel Carnahan, Governor of the State of Missouri; Bob Holden, Treasurer of the State of Missouri; Missouri State Board of Education; Peter Herschend, Member of the Missouri State Board of Education;

Raymond McCallister, Jr., Reverend, Member of the Missouri State Board of Education; Susan D. Finke, President, Member of the Missouri State Board of Education; Thomas R. Davis, Member of the Missouri State Board of Education; Robert E. Bartman, Commissioner of Education of the State of Missouri; Gary D. Cunningham, Member of the Missouri State Board of Education; Rebecca M. Cook, Member of the Missouri State Board of Education; Sharon M. Williams, Member of the Missouri State Board of Education; Jacquelline Wellington, Member of the Missouri State Board of Education, Defendants–Appellees,

School District of Kansas City; Walter L. Marks, Superintendent thereof, Defendants–Appellees.

Kalima JENKINS, by her friend, Kamau AGYEI; Carolyn Dawson, by her next friend Richard Dawson; Tufanza A. Byrd, by her next friend, Teresa Byrd; Derek A. Dydell; Terrance Cason, by his next friend, Antoria Cason; Jonathan Wiggins, by his next friend, Rosemary Jacobs Love; Kirk Allan Ward, by his next friend, Mary Ward, Plaintiffs,

Robert M. Hall, by his next friend, Denise Hall, Plaintiff,

Dwayne A. Turrentine, by his next friend, Sheila Turrentine; Gregory A. Pugh, by his next friend, David Winters, on behalf of themselves and all others similarly situated, Plaintiffs,

American Federation of Teachers, Local 691, Intervenor,

v.

STATE OF MISSOURI; Mel Carnahan, Governor of the State of Missouri; Bob Holden, Treasurer of the State of Missouri; Missouri State Board of Education; Peter Herschend, Member of the Missouri State Board of Education;

Raymond McCallister, Jr., Reverend, Member of the Missouri State Board of Education; Susan D. Finke, President, Member of the Missouri State Board of Education; Thomas R. Davis, Member of the Missouri State Board of Education; Robert E. Bartman, Commissioner of Education of the State of Missouri; Gary D. Cunningham, Member of the Missouri State Board of Education; Rebecca M. Cook, Member of the Missouri State Board of Education; Sharon M. Williams, Member of the Missouri State Board of Education; Jacquelline Wellington, Member of the Missouri State Board of Education, Defendants–Appellants,

School District of Kansas City; Walter L. Marks, Superintendent thereof; Paul V. Arena, Member of the Board of Directors; Paul B. Ballard, Member of the Board of Directors; Alex P. Ellison, Member of the Board of Directors; Dr. Julia H. Hill, Member of the Board of Directors; Rev. John Navarre, Member of the Board of Directors; Aasim Baheyadeen, Member of the Board of Directors; Ruth L. Bauch, Member of the Board of Directors; Sue Fulson, Member of the Board of Directors; E.J. Holland, Jr., Member of the Board of Directors, Defendants.

Nos. 94–1405, 94–1408, 94–1414, 94–1496 and 94–1681.

United States Court of Appeals, Eighth Circuit.

Submitted May 4, 1994 and June 1, 1994.

Decided Oct. 13, 1994.

Arthur Benson and Diane Moritz, Kansas City, MO, for appellant.

Michael Fields, Jefferson City, MO, for appellee.

Before McMILLIAN, Circuit Judge, and HEANEY and JOHN R. GIBSON, Senior Circuit Judges.

JOHN R. GIBSON, Senior Circuit Judge.

The efforts to establish a voluntary inter-district transfer plan as a part of the remedy in the Kansas City school desegregation case are before us again. The district court disapproved a plan negotiated between the Jenkins Class and the North Kansas City School District. It also found the State's plan reasonable and a basic starting point for negotiation on a voluntary interdistrict transfer plan, and ordered the parties to attempt to negotiate. The Jenkins Class has appealed this order. In addition, pursuant to a suggestion made by the Desegregation Monitoring Committee, the district court approved a SHARE NET plan in which students in various suburban districts would communicate by electronic mail or fax through the use of computers with students in the Kansas City Missouri School District. The Jenkins Class, Kansas City Missouri School District and the State of Missouri all appeal from entry of this order. We affirm the district court order refusing to approve the North Kansas City School District transfer plan, reverse the order approving the SHARE NET plan, and remand to the district court for further proceedings for the purpose of putting a voluntary interdistrict transfer plan in place.

The voluntary interdistrict plan negotiated between counsel for the Jenkins Class and NKCSD was before us in *Jenkins v. Missouri*, 981 F.2d 1009 (8th Cir.1992) (*Jenkins VIII*), and we remanded for further consideration of, and for renewed efforts to effectuate, such a plan. *Id.* at 1016. The district court, in the order now before us (Appeal No. 94–1405), referred to its earlier order which suggested that consideration be given to withdrawal of court ordered funding with alternatives of three, five, seven and ten year intervals to be considered. Slip op. at 2 (Dec. 22, 1993) (referring to slip op. at 21 (W.D.Mo. April 16, 1993)).[1] The court stated that before it could consider the eventual declaration of unitary status in the case, it is essential that the desegregation goals once met have a significant chance of being maintained. Slip op. at 2 (Dec. 22, 1993) (citing

*Jenkins v. Missouri*, 11 F.3d 755 (8th Cir. 1993) (*Jenkins IX*)). "To that end, it is the court's opinion that a viable VIT plan is absolutely essential." *Id.*

The court then stated that it had determined that "the State's plan is wholly reasonable, and the changes it has made to the *Liddell* formula for implementation allows the receiving district to be able to receive compensation for all its expenditures" associated with such a plan. *Id.* at 3. The court further stated: "However, there is one glaring problem with the State's plan: Not one suburban district has agreed to participate under such an agreement." It then stated that it believed the potential rewards of the North Kansas City plan was the reason. The court then commented that it believed that while the State's plan was reasonable, "there may well be sufficient negotiating room above the terms outlined by the State for several viable alternatives to be created." *Id.*

The court then analyzed the North Kansas City plan and found it to be inequitable in a number of respects. *Id.* at 3–7. The court's main concern was that the plan resulted in an open ended amount of funding for the receiving district. *Id.* at 4.

The district court pointed to a number of specific deficiencies in the NKC plan. *Id.* at 3–7. The provision for an initial five to fifteen teachers in year one of the plan was found to be wholly unreasonable, and the result of another fundamental flaw in the plan, namely that NKCSD would make the decision as to the schools the transfer students would attend without any clear standard for such assignments. *Id.* at 4. The requirement of a school nurse for any site that houses transfer students was also an open ended provision and was unreasonable. *Id.* at 5. The end result was that the State would be responsible for funding the entire health services of the North Kansas City School District. *Id.* This it found was inherently unreasonable and in direct conflict

1. All of the district court opinions to which we refer are captioned *Jenkins v. Missouri* and entered under district court docket number 77–0420–CV–W–4. None of these opinions were published. For simplicity's sake, we will cite them in the following form: slip op., page number and date.

with the basic principles of *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II* ). Slip op. at 5 (Dec. 22, 1993).

With respect to construction of additional classroom facilities in NKCSD at a cost of in excess of $4 million, the district court found the Jenkins Class had failed to present sufficient evidence to prove that NKCSD is currently at capacity. *Id.* at 5–6. It was important to the court as well as to NKCSD that there be no adverse impact on the quality of education in the receiving district as a result of the VIT plan, and the adverse effect on class size is a relevant measurement. *Id.* at 5. Where some capacity existed within the desirable ranges, the court stated it was not at liberty to fund construction. *Id.* While the State's plan contains provision for reimbursement for capital costs incurred by the receiving district, its evidence was not adequate on the issue of capacity. *Id.* at 6. The testimony of the State's witness, Dr. Black, was found to be not wholly credible as he had provided an analysis indicating that NKCSD was at capacity when he was evaluating the district before the VIT submission, but after the proposal his calculation showed NKCSD to have excess capacity. *Id.* The court expressly found that "the expenditure of capital funds in the receiving district as a result of the VIT program should be compensated." The NKC plan however requested funding when there was "neither a showing of actual transfer numbers, nor an adequate showing of capacity requirements." *Id.* These two issues should be addressed, the court stated, before it could guarantee funding for transfer students at a certain level when there is no guarantee that such numbers will actually participate. *Id.*

The court further expressed concern with the recruitment process in the NKC plan which called for the "plaintiff's representatives to be the ultimate arbiter in the process." *Id.* The court stated that a committee should be selected which would be responsible for the screening of applicants. *Id.* at 7.

The court found NKCSD's concerns about involving itself in the litigation to be reasonable, but that the provisions in the plan for the exemption of liability were of some concern. Even more so was the provision that the Desegregation Monitoring Committee would have no authority or involvement in the VIT program or its administration. This it found to be "unacceptable and reason alone to reject the NKC plan." It would be irresponsible for the court to adopt a plan without control over the ultimate use of the funds. *Id.* It could not and would not approve a plan which would limit the ability of the court, through the desegregation monitoring committee, to monitor the desegregation program. *Id.*

The court pointed out that it had rejected the same plan offered by NKCSD on two previous occasions. *Id.* at 8. It believed, however, that the parties had "taken an important first step." The NKC plan, however, was unreasonable and was rejected, and the State plan was wholly reasonable but has not been accepted. The State plan was found to be "the appropriate starting point for negotiation of a viable VIT plan." The court then ordered the parties to meet with NKCSD officials to attempt to negotiate a VIT plan that addresses the enumerated concerns. *Id.*

The district court, consistent with our suggestion in *Jenkins VIII*, appointed Magistrate Judge Robert E. Larsen to attempt to bring the parties together to negotiate a successful transfer plan. *Jenkins VIII*, 981 F.2d at 1016. Judge Larsen has filed reports indicating that his efforts were not successful.

The Desegregation Monitoring Committee in the summer of 1993 proposed to Judge Clark a SHARE NET plan for voluntary student transfers. Slip op. at 1 (Aug. 9, 1993). Under SHARE NET students in suburban districts would communicate with selected students in KCMSD using computers and either electronic mail or fax transmissions. Every other week they would take joint field trips outside either of the school districts. Summer camp sessions were part of the program. The district court expressed the hope that the SHARE NET plan could be considered an initial positive step toward establishment of a voluntary interdistrict transfer plan. Slip op. at 5–6 (Jan. 10, 1994). Comments of the parties were sought, and

KCMSD, the Jenkins Class, American Federation of Teachers, and the State all objected that the plan was not a student transfer plan at all. The Desegregation Monitoring Committee then forwarded to the district court a proposed budget, and a hearing was held at which opposition was expressed by the parties. The district court expressed the thought that the SHARE NET plan offered opportunity for children of KCMSD and participating suburban districts to "interact both via computer and in joint field trip and summer camp settings." Slip op. at 3 (Jan. 10, 1994). It found that the SHARE NET proposal offers "opportunities which are beneficial to the remedial plan in the KCMSD." *Id.* The district court further found that "the opportunity for interaction through computers is a positive step to the desegregation program," and offered "sufficient desegregative and educational opportunities for the court to order it funded as part of the remedial plan." *Id.* at 4. It further found that the SHARE NET plan offered "opportunities to both the children of KCMSD and the suburban school districts," as an "important first step in the renewed relationship between these entities." *Id.* at 5. The district court ordered funding of the program at a cost of approximately $1.2 million.

The State moved to alter or amend. *See* slip op. at 1 (Feb. 14, 1994). The district court, in an order denying this motion, looked to affidavits of suburban school administrators that the SHARE NET program provided a means of establishing relationships between administrators, students and patrons of the suburban districts and KCMSD, and that it would be a beginning of a fruitful dialogue in the area of interdistrict transfer with some educational benefit. *Id.* at 2. The court found that the program had substantial merit as an educational tool and as an opportunity for KCMSD and the suburban districts to begin to develop positive relationships, and allowed the program to continue. *Id.*

The State, KCMSD and the Jenkins Class all appealed. (Appeal Nos. 94–1408, 94–1496, 94–1414, 94–1681). The district court filed a statement of its reasons for adopting the plan.

After the filing of this appeal, a motion to stay implementation of this order was filed with us, and after first granting the motion in its entirety, we later amended our order to permit the summer camp program to proceed in the summer of 1994 because, at the time we considered the motion, $250,000 had already been expended toward the program, and another $200,000 was yet to be expended.

Following our order and presentation of statements of positions of the parties at the argument in the related appeal, the district court scheduled an additional hearing on the SHARE NET program and took testimony from a number of witnesses. This record has now been certified to us.

## I.

■ While we are sympathetic with the position of the district court in approving the SHARE NET program, in view of the long and frustrating history of efforts to achieve a voluntary interdistrict transfer plan, we believe that the SHARE NET plan lies outside the limited area available to the district court in crafting a desegregation remedy. *Milliken II* teaches that the remedy must be determined by the nature and scope of the constitutional violation, and be designed "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken II*, 433 U.S. at 280–81, 97 S.Ct. at 2757 (quoting *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*)). The shortcoming of the SHARE NET plan is simply that the high water mark of the record in support of the plan is that it will build relationships between students of KCMSD and the suburban districts, as well as teachers and administrators, begin a fruitful dialogue in the area of interdistrict transfer, and develop positive relationships. There is simply not evidence in the record before the district court that the establishment of such a plan and its successful implementation would remedy any constitutional violations.

What we have before us is simply a voluntary interdistrict electronic communication program which will indeed put students in

the differing districts in contact with each other electronically, but not in the physical sense. The students are in reality sitting before computer screens miles apart.

A somewhat similar plan involving two-way television contact with weekly classroom visits was rejected by the Fifth Circuit in *Tasby v. Estes*, 517 F.2d 92 (5th Cir.), *cert. denied*, 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975).

The record before the district court reveals that numerous witnesses, even those devising the program, admitted that the plan would not materially advance the cause of desegregation or have a positive effect on the racial composition of any KCMSD school. There was testimony that the program would more likely have a negative effect on desegregation, that it was incompatible with certain KCMSD magnet themes, and that it might compete with the district's computer magnets for suburban transfer students. In addition, there was testimony that the requirement of two hour blocks of time set aside for utilization of the program would have a deleterious influence on not only the magnet programs in many of the schools, but the other educational programs in KCMSD.

The statements of the Desegregation Monitoring Committee demonstrate the critical weakness of the plan. The DMC hoped the plan would be considered as an initial positive step toward establishment of a VIT plan. We believe that more than initial positive steps must be required to meet *Milliken II.* Indeed there was no evidence submitted that the plan would have a desegregative impact upon student enrollment in KCMSD.

In addition, an examination of the plan reveals that the cooperating suburban school districts would receive computers, modems, fax machines and other equipment, as well as an unrestricted annual cash payment of $1,750 per student, which under the plan need not be spent on the SHARE NET program itself but could be utilized for any purpose. The other students at the suburban district schools would have use of the computer equipment. We believe that the evidence demonstrates that the plan cannot pass muster under *Milliken II.*

With respect to the summer camp program involving students of the participating suburban districts and KCMSD, the district court is at liberty to assess the experience of the camp conducted in the summer of 1994, and if it concludes that the camps had an appropriate desegregative function, may consider continuation of them.

## II.

■ The Jenkins Class argues that the district court has abused its discretion and erred in finding that the terms of the North Kansas City VIT proposal are wholly unreasonable, and argues that the proposal is a constitutionally permissible method of implementing the desegregation remedy. It argues that the plan utilizes a formula reflecting the district's incremental expenditures, assures cost neutrality, and in the long run closely approximates the Liddell funding formula. The Class argues that the evidence and the State's admissions conclusively establish that NKCSD requires additional capital facilities in order to implement its VIT plan, that it is reasonable for NKC to utilize its discretion in the assignment of transfer students, and that the district court gave weight to irrelevant and otherwise improper factors in rejecting the NKCSD plan.

We are convinced that the district court did not abuse its discretion when it concluded that the North Kansas City plan was unreasonable, and that the determination was based on findings of fact that are not clearly erroneous.

We have referred above to the findings with respect to operating costs, specifically the funding for additional teachers and nurses. *See* slip op. at 4–5 (Dec. 22, 1993). The district court did not clearly err in making these findings.

With respect to the additional classroom facilities, it has not been shown that the district court clearly erred in finding that the plaintiffs failed to present sufficient evidence to prove that NKCSD was currently at capacity. *Id.* at 5. The court left the issue open for further exploration. *Id.* The court expressly found that expenditure of capital funds in the receiving district as a result of a

VIT program should be compensated, and with this proposition the State had no quarrel, *id.* at 6, nor do we. The court's rejection of capital funding was based on the fact that there was "neither a showing of actual transfer numbers, nor an adequate showing of capacity requirements." *Id.* The district court did not abuse its discretion in these rulings, nor were the underlying findings of fact, decided in part on credibility determination, clearly erroneous.

The district court did not abuse its discretion in encouraging the selection of a committee that would be responsible for the screening of applicants.

The district court further found that the plan submitted by the State is a reasonable one, with the obvious deficiency that not one suburban district has agreed to participate. *Id.* at 8. The district court added "there may well be sufficient negotiating room above the terms outlined by the State for several viable alternatives to be created." *Id.* at 3. The Jenkins Class position on appeal has been to forego specific attacks on the State plan, but simply to argue generally that the NKCSD plan is preferable, that it could be implemented, and represents the only terms under which it will participate, and that any further efforts will be futile.

The ultimate point made by the district court was that while the NKCSD plan was unreasonable, and that of the State reasonable but ineffective, the State plan did create a starting point for development of an interdistrict plan that will be effective in achieving the actual transfer of students. *Id.* at 8.

### III.

In *Jenkins VIII*, we traced the orders of both the district court and this court calling for creation of a voluntary interdistrict transfer plan. *Jenkins VIII*, 981 F.2d at 1011. Our en banc decision in *Jenkins v. Missouri*,

807 F.2d 657, 683–84 (8th Cir.1986) (*Jenkins I* ), *cert. denied,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987), requires no less. Judge Clark has made clear that a viable VIT plan is absolutely essential before consideration can be given to eventual declaration of unitary status. In *Jenkins VIII* we recognized that "the State, through its legislative and administrative bodies has authority to effectively establish an interdistrict plan if it chooses, and may require suburban districts to accept minority transfer students from KCMSD." *Jenkins VIII*, 981 F.2d at 1016. "The State could establish such a plan and implement it without constraints that limit the courts." *Id.* We pointed to "the meaningful and effective action of the State in establishing such plans as demonstration of a commencement of responsible assumption of local control of educational policies as referred to in [*Board of Education v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), and *Freeman v. Pitts,* —— U.S. ——, ——, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992) ]." *Jenkins VIII*, 981 F.2d at 1016.

We are mindful that the Supreme Court has granted certiorari to consider our opinion in *Jenkins v. Missouri,* 11 F.3d 755 (8th Cir.1993) (*Jenkins IX*), dealing with whether the quality education programs were unitary,[2] one facet of the desegregation program in Kansas City. The issue of the unitariness of the other aspects has not yet been put in issue in this case. Thus, a viable interdistrict transfer plan may be validly considered by the district court in determining whether further orders declaring the district to be unitary may properly be entered.

It is evident that the State's plan, no matter how reasonable, has failed to attract favorable reaction from the suburban school districts. Slip op. at 3 (Dec. 22, 1993). For the plan to be successful, and to promise "realistically to work now,"[3] more must be done either by way of further inducements to

---

**2.** There we followed the teachings of *Dowell,* 498 U.S. at 249, 111 S.Ct. at 637–38, and *Freeman,* —— U.S. at ——, 112 S.Ct. at 1446, in holding that the quality education programs were not unitary. *Jenkins IX*, 11 F.3d at 765. *See also Jenkins v. Missouri,* 23 F.3d 1297 (8th Cir.1994) (*Jenkins XI* ). *Jenkins XI* deals with the same arguments repeated in less than a year with

respect to the district court's order on the quality education programs for two later school years.

**3.** *Green v. New Kent County Sch. Bd.,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1694–95, 20 L.Ed.2d 716 (1968), *quoted in Freeman,* —— U.S. at ——, 112 S.Ct. at 1436, and *Jenkins VIII,* 981 F.2d at 1016.

the suburban districts, or in more coercive actions that the State is empowered to take. As the district court recognized some nine years ago, if the State does not demonstrate its commitment, the court "will seek other methods of accomplishing the [VIT] at the State's expense." *Jenkins v. Missouri,* 639 F.Supp. 19, 51 (W.D.Mo.1985), *aff'd as modified,* 807 F.2d 657 (8th Cir.1986), *cert. denied,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987).

It must be remembered that a voluntary interdistrict transfer plan is voluntary insofar as the suburban school districts, and the students from KCMSD that are interested in transferring to such districts, are concerned. The State of Missouri, however, is a constitutional violator, and is subject to coercive remedial orders. The district court should not hesitate to explore the propriety of further incentives, including some suggested by NKCSD, that are consistent with prior orders of this court and that will enhance the probability of an effective voluntary interdistrict transfer plan being established. To this end we remand to the district court with directions to spell out in detail a plan that will meet constitutional standards, and be sufficiently attractive to the suburban districts to "work now." The district court may, if it deems it appropriate, order state educational officials to assist in this effort. When this has been done, the suburban school districts will for the first time have a specific plan to consider.

Many of the provisions in the State's plan, insofar as they are consistent with what we say today, may be incorporated essentially as written. A few further words are in order.

The State accepts the proposition that incremental expenditures for operating expenses so as to assure cost neutrality must be a part of such a plan. Further, the State accepts the proposition that capital expenditures in the suburban school districts that are necessary to accommodate such programs, where current capacity is not available, is a required aspect of the plan. As we pointed out in *Jenkins VIII,* 981 F.2d at

1015, if this requires adjustments for lessened need for facilities in KCMSD, such offsets can be made. The State accepts responsibility for the required transportation.

Further, the State plan contains provision for a voluntary interdistrict transfer authority with responsibility to recruit and arrange for assignment of students to the various suburban districts, and to perform an oversight function so as to make unnecessary detailed supervision by the Desegregation Monitoring Committee. However, some reporting function by the DMC may be desirable so as to satisfy the concerns of the district court, and to supplement those reports that may be received from the voluntary interdistrict transfer authority.[4] *See* slip op. at 7 (Dec. 22, 1993).

We are mindful of the difficult issues that are presented by the differing indemnity provisions that have been contained in the several plans. We recognize the importance of such provisions, but are also concerned that they not be used to avoid legal responsibility unduly. The crafting of such provision we believe is best left to the discretion of the district court.

We believe that there are other modifications and supplements to the State plan that are consistent with prior orders of this court and that could reasonably be expected to encourage suburban school districts to participate in a voluntary interdistrict transfer plan:

(1) the State should be required to provide funding for the construction, expansion and renovation of capital facilities in participating SSDs for the purpose of providing such space as will allow each SSD to maintain existing class size and school assignment policies;

(2) in the first year of operation of any such plan, VIT students will attend SSDs on a space available basis, and the State will survey participating SSDs to arrive at a uniform assessment of the space available, and foreseeably available, and of the additional capital support that would be

---

4. The State has objected to the definition of minority students in the NKCSD plan to include minorities other than African–Americans, specifically Hispanic and Asian students. Law of the case may govern the issue, but we believe that it should first be considered by the district court.

required to allow the participating SSDs to accept additional students consistent with their current class size and assignment policy;

(3) the policy of school selection may be by transportation zones within KCMSD which will govern student placement and assignment, except when it is necessary for a participating SSD to accept students from other zones in order to meet its commitment with respect to the number of transferring students it will accept;

(4) the district court should establish a limit to the obligation of the State to fund transfers to a specific number of eligible students; the State suggested limit seems reasonable to us; and

(5) the district court should determine a specific minimum period of commitment for each participating SSD when no capital improvements have been involved, possibly three years. The acceptance of funding for capital improvements should carry a concomitant commitment to accept VIT students during a longer period, considering the effective life of the improvements, and the termination point for court ordered desegregation funding.

Certainly the district court, with its long experience in attempting to initiate a voluntary interdistrict transfer plan, will have thoughts as to additional provisions that are consistent with the prior orders of this court and that could reasonably be expected to encourage suburban school districts to participate in the voluntary interdistrict transfer plan. The task of the district court is to exercise its best judgment to develop a plan that will have the best chance of being accepted by the suburban district. These should be incorporated in an amended plan that the State, if need be, may be compelled to offer to these districts.

We affirm the order of the district court with respect to the North Kansas City plan, reverse as to SHARE NET, and remand for development of a plan the state shall offer to suburban districts.