George ARTHUR, et al., Plaintiffs,

v.

Ewald P. NYQUIST, et al., Defendants.

No. 72–CV–325C.

United States District Court,
W.D. New York.

Oct. 18, 1995.

David Gerald Jay, Buffalo, N.Y., for plaintiffs.

Aubrey V. McCutcheon, Jr., Detroit, Mich., Special Counsel for Buffalo Board of Education, for defendants Superintendent of Schools Eugene T. Reville and Board of Education.

Offermann, Mahoney, Cassano, Pigott & Greco (David J. Mahoney, and Eugene F. Pigott, Jr., of counsel), Buffalo, N.Y., for Board of Education.

O'Shea, Reynolds, Napier, Quinn & Cummings (John H. Napier, and Kenneth R. Kirby, of counsel), Buffalo, N.Y., for defendant Mayor James D. Griffin.

Falk & Siemer (Alvin M. Glick, and Mary K. Roach, of counsel), Buffalo, N.Y., for defendant Common Council of City of Buffalo.

Jaeckle, Fleischmann & Mugel (J. Edmund deCastro, Jr., of counsel), Buffalo, N.Y., for plaintiff-intervenor Community Advisory Board for Bilingual Education of Buffalo.

Bouvier, O'Connor (Bruce A. Goldstein, of counsel), Buffalo, N.Y., for plaintiff-intervenors handicapped children.

National Education Association of New York (Robert W. Klingensmith, Jr., of counsel), Buffalo, N.Y., for defendant-intervenor Buffalo Teachers Federation.

CURTIN, District Judge.

This court has been struggling with the issues in the Buffalo School Case since 1974. After a trial, the court found the defendant Board of Education ("the Board"), the City of Buffalo ("the City"), and the State of New York liable in a decision filed on April 30,

1976. *Arthur v. Nyquist,* 415 F.Supp. 904 (W.D.N.Y.1976). The decision was affirmed in part by the United States Court of Appeals for the Second Circuit. *Arthur v. Nyquist,* 573 F.2d 134 (2d Cir.1976). The court's finding of liability on the part of the Board and the City was affirmed, and that on the part of the State of New York was reversed.

In a decision to be filed in several weeks, the court will set forth in detail the history of the progress of the remedy phase of this case. But at the present time, the court will turn to the issues which require immediate resolution.

There are several applications pending. Many papers have been filed in support of each application, but the issues presented may be summarized as follows.

1. There are various motions by the City and other parties for a declaration of unitary status, or partial unitary status, under the principles laid down in *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), and *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

2. The Board has submitted an Order to Show Cause why it should not be authorized to proceed to operate its schools in the 1995–96 school year at a funding level that it claims will not permit compliance with this court's desegregation orders to the extent of compliance in 1994–95.

3. The plaintiffs have filed a cross motion for an order directing the City to provide, in the 1995–96 school year, certain funds necessary to maintain programs that the plaintiffs consider crucial to the continued success of the desegregation program.

In *Freeman v. Pitts,* the Supreme Court reemphasized that "[t]he duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." 503 U.S. at 485, 112 S.Ct. at 1442. In supervising a desegregation case, a district court's authority is limited: "A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." *Id.* at 489, 112 S.Ct. at 1444. "[I]n the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations." *Id.* at 490, 112 S.Ct. at 1445. During the final phases of a desegregation case, "[t]he District Court should address itself to whether the Board ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." 503 U.S. at 492, 112 S.Ct. at 1446 (quoting *Dowell,* 498 U.S. at 249–50, 111 S.Ct. at 637–38). "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *Id.* 503 U.S. at 490, 112 S.Ct. at 1445. As the Supreme Court stated:

> the court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.... ("[T]he federal courts in devising a remedy must take in account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.") ... In *Dowell,* we emphasized that federal judicial supervision of local school systems was intended as a "temporary measure." ... Although this temporary measure has lasted decades, the ultimate objective has not changed—to return school districts to the control of local authorities.... [A] court [must] provide an orderly means for withdrawing from control when it is shown that the school district has attained the requisite degree of compliance. A transition phase in which control is relinquished in a gradual way is an appropriate means to this end.

> .   .   .   .   .

> In considering the[ ] factors [which must inform the discretion of the court in ordering partial or complete withdrawal of its supervision of a desegregation case], a court should give particular attention to the school system's record of compliance. A school system is better positioned to

demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations. And, with the passage of time, the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish, and the practicability and efficacy of various remedies can be evaluated with more precision.

503 U.S. at 489–92, 112 S.Ct. at 1444–46.

In this case, the City urges that unitary status has been achieved in the areas of faculty and staff hiring, student assignment, and transportation, and that as a result it should be dismissed as a defendant. The Board agrees that unitary status has been achieved in most areas, but maintains that there should be no such finding in the absence of a good-faith commitment from the City that it will meet its obligation to fund the School District to the extent necessary for the District to meet its obligations to the children attending the Buffalo schools, including the obligation to maintain a high-quality desegregated education program. The plaintiffs oppose a finding of unitary status at this time, believing that such a finding would be premature.

■ In accordance with the guidance of *Freeman* and other Supreme Court cases, I have carefully considered the detailed record supplied in this case, and the good faith and responsibility of the Board, the City, and the other participants. I have concluded that unitary status has now been attained, and that supervision of the School District shall be returned to the Board under terms which will be outlined in this order. Because of the need to provide immediate financial assistance to the Board, I will issue a summary order now, to be followed by a more detailed explanation for the declaration of unitary status as soon as is practicable.

At this point, I should briefly review the history of this litigation after the original liability order was filed on April 30, 1976. Within a few weeks, on May 18, 1976, the Board filed what was known as the "Phase I" plan. The plan provided that ten schools should be closed and their population merged with other schools in the district. This had the immediate effect of enhancing racial balance and also improving educational efforts, because the schools which were closed were either too small or in poor condition.

Two magnet schools, the Waterfront School and City Honors, were opened. The transportation system was instituted, and the school staff immediately addressed the difficult problems connected with the practicalities of transportation, and the provision of suitable lunchroom and other facilities in the schools so that the movement of students could be more easily facilitated.

Phase II was filed and approved on January 5, 1977. This plan included the implementation of eight magnet schools: Academic Challenge, Build Academy, Campus East, Campus West, Follow–Through, Montessori, Buffalo Academy for the Visual and Performing Acts, and Buffalo Traditional School. There were three so-called mini-magnets opened: School 19, with a Native American program, and School 33, with a Spanish–English program. East High School was converted to Buffalo Vocational Technical Center. There was an addition to Phase II in August 1979, when four more schools were closed. In the summer of 1980, Phase III was approved by the court. This provided that ten additional schools be closed, six Early Childhood Centers were opened on a voluntary basis, and four new magnets—Futures Academy, Martin Luther King, Multi–Cultural Institute, and the Science Magnet—were opened. The Early Childhood Centers provided education to students from pre-K through Grade 2. The academies provided education for students in Grades 3 through 8. In May 1981, the court approved Phase IIIx, which provided for clusters of Early Childhood Centers with the Academies.

### STUDENT ASSIGNMENT TO SCHOOLS

When the court made its original liability decision in 1976, it found that in the 1973–74 school year, 55 of the City's 77 elementary schools, 5 of the 6 middle and junior schools, and 7 of the 13 high schools were 80 to 100 percent majority or minority race students. The school population was 61,000, of whom

53 percent were majority and 46 percent were minority. The record indicates that soon after the order was filed, the Board began to assign students in a fashion which brought about integration in most of the City's schools. This balance continued throughout the years. Furthermore, in its assignment of teachers to the schools, the Board attempted to fashion an orderly mix of majority and minority teachers. That is not to say that the plan was always perfect. With some justification, the Board was criticized for putting too great an emphasis on the operation of the magnet schools, with the result that sometimes the other schools lacked sufficient attention.

The record indicates that in July, 1994, the total enrollment was 47,852, of whom 30,652 were minority and 17,200 were majority. This would indicate a 64 percent minority enrollment, a much higher percentage than in 1973–74. By 1993–94, 37 of the 58 elementary schools were within court-ordered guidelines establishing that schools should comprise no more than 65 percent and no less than 30 percent minority students. An additional seven elementary schools were within 3 percent of the guidelines. Enrollment in six of the 14 high schools and the shared service vocational school (Buffalo Vocational Technical Center) also exceeded the guidelines. These figures demonstrate great strides towards a desegregated school system, and are evidence of the commitment of the Board to achieving racial balance in student assignments. Item 1849.

Over the years there has been a slow decline in student enrollment, and in the enrollment of majority students in particular. This has come about because of the declining trend in the City population, the lack of employment opportunities in the City proper, and other reasons not related principally to any activities of the School Board or the City. It should be observed that from 1975 until the 1994 school year, minority student enrollment increased by 2,904 (10.5 percent), while majority enrollment decreased by 12,-596 (43.1 percent). The decline in school population, and especially in majority student enrollment, has been slight from year to

year, but the overall impact, as can be seen, is substantial.

The Board publishes a yearly report showing the number of students in each school and the percentages of minority and majority students at each school. Item 1973. For example, in the 1981 school year, the total number of students was 46,918, with a 53.6 percent minority representation. At that time most of the schools were in the range from 40 to 60 percent minority.

The record shows that from the beginning, the Board has done its best to keep racial balance between the schools while still providing the best educational opportunities to its students within its means. That the system provides appropriate quality education is borne out by reports such as the New York State of Learning Report. Item 2032. For the year 1994, for example, the Buffalo schools compared favorably to other large city schools in New York State.

### THE HIRING AND ASSIGNMENT OF STAFF

On August 8, 1980, the court issued a hiring order which approved the suggestion made by the Board that it should attempt to provide at least a 21 percent minority representation for every position on the Board's staff. Item 428. It provided that there be a one-for-one hiring progression until the 21–percent representation level was reached. The hiring order provides that employment will alternate between a majority individual and a minority individual, depending upon which was appointed last to that position. Certain employment categories have not reached 21 percent, but the failure to reach this goal is not related to any discriminatory acts of the Board; rather, it is due to an inadequate number of qualified minority candidates applying in certain job categories. *See* Item 1623, pp. 12–13.

As of October 30, 1994, the Board employed 6,765 full-time individuals. Of this total, 30.4 percent were minorities. In some categories, the percentages of minorities were below the 21–percent goal—*e.g.*, secondary school teachers, which increased from 20.1 percent in October 1993 to 20.7 percent in 1994; special area staff, which was at 20.3

percent in 1994; and remedial teachers, at 18.8 percent in October 1993. Item 1913, p. 4. But for the most part, the 21-percent goal has been achieved. Further, there is a balanced representation of minority teachers in all of the schools. Item 1862, Table 19, Remedial Action Report for 1994. The Board has instituted a Minority teacher recruitment effort. The report of August 1, 1994, is typical of the continuing effort of the Board to recruit minority teachers. Item 1858.

The Buffalo Teachers Federation supports the grant of unitary status with some misgivings, urging that the City be required to continue providing the financial support necessary to sustain the educational programs that are, in the Federation's view, essential to maintaining a desegregated school system. Items 1919 and 1954. The Federation suggests that unitary status has been reached for faculty because one-for-one hiring goals have been met in almost all tenure areas and there is no evidence of any discriminatory conduct on the part of the Board. Items 1883 and 1929.

The declaration of unitary status in the hiring and assignment of staff is supported by the Buffalo Municipal Civil Service Commission ("BMCSC"). If it were not for the hiring order, the BMCSC would supervise the selection of candidates for non-instructional positions with the Board in accordance with the Civil Service laws of New York. The BMCSC argues that it should not have been subjected to the August 1980 order, and seeks reconsideration of that order. The motion for reconsideration is denied. However, the record supports the position of the BMCSC that the Board and the BMCSC have complied with the hiring goals for non-instructional staff. The percentage of minorities and non-instructional staff positions is 43 percent, and it has been greater than 40 percent since at least 1988. See Item 1917.

### PENDING APPLICATION FOR IMMEDI-ATE RELIEF AND APPLICATION FOR UNITARY STATUS

As long ago as 1992, the City and the BMCSC filed extensive motions and briefs in support of a declaration of unitary status in the areas of faculty and staff hiring, student assignment, and transportation. See, e.g., Item 1621–23. Many other papers were filed in support of such a motion. The Board has opposed the applications, as have the plaintiffs (Item 1677), the Handicapped Intervenors (Item 1679), and the Hispanic Intervenors (Item 1680).

After discussion, the parties agreed that private negotiations might help resolve the numerous issues. With the court's urging, a series of discussions followed, in which an attempt was made to settle the case. The settlement negotiations were referred to United States Magistrate Judge Leslie G. Foschio, who met with the parties on a number of occasions to try to finalize a settlement agreement. A proposed consent decree was fashioned but never finalized or adopted (see Item 1849).

Nevertheless, the discussions between the parties were helpful in focusing their attention on the need to provide adequate funding for the City schools, and also the responsibility of the Board to attempt to run the schools in a more organized fashion.

In the spring of 1995, the Board filed with the court a draft of a proposed Phase IV to the School Desegregation Plan. Item 1866. In response, the City informed the court that it took the position that the proposal for a Phase IV desegregation plan was premature, and should not be taken up by the court while the City's motions seeking partial unitary status were still outstanding. Item 1866. On July 10, 1995, it filed a supplemental brief in support of those motions. Item 1913. In a reply filed on July 17, 1995, the Board indicated that it would support the City's request that the District be declared unitary in the areas of student assignment, transportation, and faculty and staff composition, "as soon as the City demonstrates its good faith effort to comply with its obligation to adequately fund the District to the extent necessary for the District to meet its educational obligations to the children who now attend and will attend Buffalo schools, including the obligation to maintain a high-quality desegregated education program for that class of students previously found to have

been the victims of segregatory acts." Item 1919, p. 5.

On July 19, 1995, the Board of Education adopted a budget for the 1995–96 school year, in the amount of $389 million. This budget, which was based on appropriated revenues from the City and anticipated revenues from all other sources, eliminated about $18 million in instructional services. The Board submitted a request for supplemental appropriations to the City, in the amount of about $5 million, on July 26, 1995. By August 21, 1995, the Board had received no additional revenue, and had determined that the anticipated 1995–96 revenues would not permit compliance with the desegregation orders of the court to the extent of compliance in the 1994–95 school year. Thereupon, it filed an application for an expedited motion seeking an order authorizing the Board to operate its schools consistent with the budget adopted on July 19, 1995, plus any supplemental appropriations from the City approved by the City or mandated by this court. Item 1937.

Two days later, the plaintiffs filed a cross motion identifying instructional programs that would be cut under the Board's 1995–96 budget as adopted, and which the plaintiffs viewed as being crucial to the continued success of the desegregation program. Item 1939. The plaintiffs indicated that the cost of restoring these programs would be $3.7 million, and requested that the court direct the City to provide the necessary funds.

On September 7, 1995, the City filed a cross motion requesting that the court issue an order finding the City to have fulfilled its obligations under the court's desegregation orders, and dismissing the City from the case. Item 1968. It proposed that under the order, the City would be required to provide to the Board a total of $20 million over a four-year period, at $5 million per year, over and above a base amount equal to the allocation to the Board for the current fiscal year, about $59 million. While not being sufficient to restore all of the programs for which the Board and the plaintiffs seek funding, the funds would enable the restoration of a substantial number of essential staffing positions. In addition, the City and the Board would establish a plan for funding capital improvements to the schools, under which the City would provide $80 million over a four-year period by the sale of bonds. Items 1968, 1969. The City's proposal is evidence of the good faith of the Mayor and the City administration.

A hearing was held on the adequacy of funding for the present school year, and also to determine whether or not unitary status, or partial unitary status, should be declared. Based upon the testimony and other evidence presented, as well as upon the large number of other submissions filed with the court, I am now in a position to make the following general observations. First, it is apparent, and all parties seem to agree, that the Board has been successful in achieving, to a large degree, the goal of desegregation of the Buffalo School District. Second, it is plain that the Board is strongly committed to continuing to pursue the goals of desegregation and of providing a high-quality education to all students in the school system. Third, it is equally clear that the Board's ability to maintain all of the elements of its desegregation program, and to sustain the quality of education provided to the students, is impeded by the instructional program cuts adopted in the Board's proposed budget for the 1995–96 school year. There is evidence that the cuts would have a disproportionate impact upon minority students. Funds must be made available immediately for the restoration of as many programs as is practicable. And lastly, it is evident that the City, although facing serious financial difficulties, has made a good-faith proposal under which it appears that the funds necessary to sustain most or all of the essential elements of the Board's desegregation efforts will be made available over the next four years, and that the City will make a very substantial contribution to funding a program for necessary capital improvements.

In arguing for declaration of partial unitary status, the City maintains that after the liability order was filed, it never acted in a discriminatory fashion and has done its best to comply with the desegregation order. The Board contends, on the other hand, that as a co-defendant, the City is obliged to

supply the funding required to enable the Board to comply with the integration order. In particular, it has argued that the desegregation goals set out in Phase IV of the School Desegregation Plan cannot be met without the financial support of the City.

The City has argued convincingly that its practical ability to raise additional funds is quite limited. Its ability to levy property tax is limited by the State Constitution. There is a 2 percent property tax limit based upon a five-year average of full property value. For the 1995–96 fiscal year, this limit is $176.6 million. For this year, the property tax level was $148 million, which leaves a margin of $28.6 million. In theory, the City could raise an additional $28.6 million in property taxes for the fiscal year 1995–96. This would be a large contribution to the operation of the schools. But the City argues that there are many other factors which it is fair for the Mayor and the Common Council to consider—*i.e.*, other needs of the City for police and fire protection, etc. The Mayor is entitled to take into account the fact that the population of the City is declining, and some argue that one of the reasons is that City taxes have increased. If they are increased further, other City residents may be persuaded to leave. This would have a further impact on the City's ability to raise funds. *See* Item 2024. At the hearing, the City called the former Chairman of the Assessment Bureau, who testified that there has been a continuing decline in the property tax values. This was accompanied by a decline in population from 426,768 in 1970 to 323,123 in 1990. Based upon his experience, he believes that these downward trends will continue.

In determining what level of funding to provide to the Board, the City must take into account its responsibility to provide funds to other City agencies, and the practical impact of an additional tax burden upon the citizens and businesses in the City. Some argue that the decline of the City population is brought about in part by increases in City taxes. Whether or not that is so, it is a fear that the Mayor and the Council are entitled to take into account. In view of these concerns, the court finds that there is no evidence that the City has failed to meet its obligation to provide whatever funds it can to support the Board's efforts to achieve desegregation in the Buffalo schools.

The Board, and several of the other parties, have taken the position that the City's involvement in this case should not be terminated in the absence of a funding formula under which the City would be obliged to continue to provide the Board, apparently for the indefinite future, with some predetermined portion of its tax revenues. I find that such a requirement would be inconsonant with the Supreme Court's guidance in *Freeman*, which makes it clear that in desegregation cases, judicial supervision is intended to be a temporary measure, that in fashioning remedies courts must take into account the strong interests of local authorities in managing their own affairs, and that courts should aim to return schools to the control of local authorities in order to restore their true accountability within our governmental system.

Taking into account all of the evidence that the Board has successfully achieved a high degree of desegregation in the Buffalo School System, as well as the commitment of both the Board and the City to sustain the effort to maintain a desegregated system and provide a high-quality education to all students, I can now find that unitary status has been achieved.

Unitary status is therefore declared. This declaration is, however, founded in part upon a requirement that the City provide funding to the Board over the next four years at the level proposed by the City in its proposal of September 7, 1995 (Items 1968, 1969). An order establishing that level of funding will be filed separately.

While I have determined that the Board has reached its goal of unitary status, I do not mean to imply that all is well in the School System. Deficiencies in certain programs remain to be dealt with. In particular, I note the listing of the Handicapped Intervenors' priority areas of ongoing noncompliance which, according to the intervenors, continue to be unaddressed and underfunded by the School District in its provision of educational programming and services to

students with disabilities. Item 1877. I also note the Handicapped Intervenors' summary of the evidence supporting reinstatement of the EASE program in the 1995–96 school year. Item 1997. With regard to the Bilingual Intervenors, I note in particular the numerous concerns raised in Items 1884, 1930, and 1998. These issues are important, and should receive the close attention of the Board. Nevertheless, in the overall picture, they do not prevent the court from reaching a finding of unitary status in this case.

Over the past several months, the court and the parties have had the opportunity to review numerous recommendations by the Buffalo Financial Plan Commission as to how the Board may reduce costs and realize considerable savings in the implementation of its programs. In his testimony on October 4, 1995 (Item 2035), Superintendent Thompson addressed these recommendations in some detail. He indicated that many of the Commission's recommendations had already been carried out, that the Board intended to carry out others, or at least investigate their feasibility, and that certain of the recommendations had been reviewed and found to be unsound in the Board's view. The Superintendent's testimony made it clear that the Board is working hard to find ways of operating more efficiently. Nevertheless, the court believes that continued efforts will have to be made to reduce operating costs and direct funds more effectively to education programs.

### CONCLUSION

Considering all of the issues discussed in this order, the parties are entitled to a declaration of unitary status. At the beginning of this decision, I referred to the Supreme Court's decision in *Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430. There, the Court said that "[t]he District Court should address itself to whether the Board ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." 503 U.S. at 492, 112 S.Ct. at 1446 (quoting *Dowell*, 498 U.S. at 249–50, 111 S.Ct. at 637–38). I find that the Board has reached the goal set forth

by the Supreme Court in its direction and is entitled to unitary status.

Furthermore, the Supreme Court has instructed that the schools should be returned to the control of the local authorities at the earliest practicable date. That is the direction of the court here. Unitary status means that complete supervision of the operation of the School District is returned to the Board.

So ordered.

### ORDER

This Court has reviewed the Order to Show Cause filed by the Local School District Defendant (Item # 1937), the Affidavit of Carol Streiff on behalf of Plaintiff's cross motion (Item # 1939), and the cross motion by the City Defendants (Item # 1968). The Court has considered the testimony and evidence presented during the hearing held on these motions and has reviewed the post-hearing submissions and arguments of the parties. Based upon all of the evidence before this Court, it is hereby

ORDERED that the City Defendants shall provide to the Board of Education for the 1995–96 budget year an additional appropriation in the amount of $5,000,000.00. This amount will be in addition to the current allocation of City revenues to the Board of Education of $59,159,970.00, which is comprised of $50,055,559.00 for Operation and Maintenance and $9,104,411.00 for the debt service on debts incurred for Board of Education purposes. The City's total appropriation to the Board of Education for the 1995–96 budget year with this additional $5,000,000.00 shall be $64,159,970.00; and it is further

ORDERED that the City shall provide to the Board of Education in each of the budget years 1996–97, 1997–98, and 1998–99 a total of $64,159,970.00 each year to cover both Operation and Maintenance and debt service incurred for Board of Education purposes; and it is further

ORDERED that this money judgement may be satisfied by the appropriation of at least the amount of $64,159,970.00 to the Board of Education in each of these budget

years. If the City incurs debt to raise any portion of this judgment, the allocation to the Board of Education shall not be reduced to pay any of the principal or interest on any of the debt service on such debt, nor shall such debt service be included in the $64,159,970.00 allocation to the Board of Education; and it is further

ORDERED that the City and Board of Education shall create a dedicated revolving capital reserve account for capital improvements to the schools (the "Capital Account"). The Capital Account shall be initially funded with $8,000,000.00 received by the Board of Education from the State of New York as payment of building reimbursement money for prior years' capital expenditures. The Board of Education shall immediately transfer such $8,000,000.00 into the Capital Account and shall deposit all State building aid reimbursement for projects funded by the Capital Account into the Capital Account. The Board of Education is authorized to retain and spend for such other purposes as determined by the Board of Education, any additional State building aid, beyond the initial $8,000,000.00, which the Board of Education receives for projects from prior years. The City shall provide the Capital Account with $80,000,000.00 in the aggregate from bond sales for the Board of Education's capital building program as required by the program schedule of cash needs. The proceeds of the Capital Account shall only be used for the Board of Education capital building program and for debt service on debts incurred to fund the establishment of the Capital Account and/or such projects. The Board of Education's capital building program shall include the design of capital projects to maximize their aidability and to accelerate the building of new schools and the refurbishment of existing schools. The Board of Education shall submit all plans and reports to the State Education Department in a timely manner to facilitate early aid approval and receipt; and it is further

ORDERED that, this Court finds that the City Defendants have complied with the previous Orders of this Court and have demonstrated their good faith in assisting in the desegregation of the Buffalo Public School System. Therefore, this civil action is dismissed against the City of Buffalo Defendants, the Mayor and members of the Common Council. In the event that the City Defendants do not comply with their obligations under this order, any party to this proceeding may petition this Court to reopen this matter.